**Jerry PAUL, Appellant,**

**v.**

**Robert PLEASANTS, etc., Appellee,**

**North Carolina Civil Liberties Union
Foundation, Inc., Amicus.**

**No. 76–1734.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 10, 1976.

Decided March 2, 1977.

Kenneth N. Flaxman, Durham, N. C., and Adam Stein, Chapel Hill, N. C. (Chambers, Stein, Ferguson & Becton, Chapel Hill, N. C., on brief), for appellant.

Richard N. League, Asst. Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh, N. C., on brief), for appellee.

William G. Pfefferkorn, Atty. for North Carolina Civil Liberties Union Legal Foundation, Inc., Winston Salem, N. C., on brief, as amicus curiae.

Before BUTZNER, WIDENER and HALL, Circuit Judges.

K. K. HALL, Circuit Judge:

Jerry Paul, a North Carolina attorney, and appellant, was lead defense counsel in the highly publicized murder prosecution of Joan Little, a young black accused and acquitted of murdering her middle-aged white jailor. Following the acquittal, the trial judge held appellant in contempt of court and sentenced him to serve fourteen days in jail for conduct which occurred during the course of jury selection.

Appellant promptly sought habeas corpus relief in the Wake County Superior Court, but relief was denied. The Court of Appeals of North Carolina granted review but affirmed the decision below. *In re Paul,* 28 N.C.App. 610, 222 S.E.2d 479 (1976). The North Carolina Supreme Court denied discretionary review. *In re Paul,* 289 N.C. 614, 223 S.E.2d 767 (1976).

Concurrent with the state appeals, appellant had filed and, following the denial of the state appeal, pressed his application for a writ of federal habeas corpus pending in district court in the Eastern District of North Carolina. The federal habeas corpus application asserted the same errors which were set forth but rejected in the state appeals. Relief was denied on May 12, 1976, a certificate of probable cause to appeal was granted, and this appeal followed.

Appellant sets forth four grounds for reversal, namely: (1) his conduct during *voir dire* was noncontemptuous and constitutionally protected; (2) assuming his conduct was contemptuous, he did not receive adequate notice and an opportunity to be heard prior to sentencing in violation of due process; (3) a hearing should have been held prior to a determination that the conduct was found to be contemptuous; and (4) the contempt matter should have been referred to a different judge for disposition. Not assigned by appellant on appeal here and raised only by amicus curiae and therefore deemed abandoned was the contention that N.C.G.S. § 5–1(1), the contempt statute, was unconstitutional. We affirm.

I.

THE CONTEMPT

On July 14, 1975, prior to the individual examination of the prospective jurors on

*voir dire,* the trial judge specifically admonished appellant against vocally continuing to object in a critical fashion once the court had ruled on a particular matter. *See: In re Paul,* 28 N.C.App. 610, 222 S.E.2d 479, 480 (1976). Nevertheless, on July 15, 1975, during the individual examination of a prospective juror, appellant, who already had spent extensive time on *voir dire,* persisted in objecting to what he believed to be an unwarranted narrowing of the scope of the admittedly non-traditional *voir dire* when certain state objections were sustained. The trial court noted that defense counsel had made an adequate record for appellate purposes, suggested he move to continue his broad "non-traditional" method of *voir dire,* which was done, and the court thereafter denied the motion.

Appellant still persisted in criticizing the court's ruling asserting that the court was biased, that the court's ruling made no sense and that the judge was deliberately favoring the state. Appellant concluded as follows:

MR. PAUL: And at this point we ask your Honor to recluse [sic] yourself because I don't think you are capable of giving Joan Little a fair trial and I don't intend to sit or stand here and see an innocent person go to jail for any reason and you can threaten me with contempt or anything else, but it does not worry me.

COURT: All right, you got that in the record.

MR. PAUL: And to sit there and say like the queen of hearts off with the heads because the law is the law is to take us back a hundred years.

COURT: All right.

MR. PAUL: And we intend to ask these questions. Now your Honor, they can object and you can sustain, but we intend to keep on asking the questions and in order for the appellate court to rule whether or not they were proper questions we have to ask the questions. It is apparent I'm quite disgusted with the whole matter, whole matter of ever bringing Joan Little to trial anyway.

There has been one roadblock after another and one attempt after another to railroad Joan Little and I am tired of it. Now we intend to ask these questions and you can sustain the objections if you want to but the appellate court cannot make a ruling on whether or not they were proper questions unless the questions are asked.

COURT: All right, you have said that twice. I haven't said you couldn't ask the questions.

MR. PAUL: And the appellate courts cannot make a judgment on whether or not the questions would have been relevant unless they get the witness' answer into the record.

COURT: Well, I'll pass on that. Are you through?

MR. PAUL: I'm through for the moment but not through for this trial.

The day after this incident, the court furnished appellant with a verbatim transcript of his remarks from the previous day and, on July 21, 1975, advised appellant that he would be cited for contempt following the jury verdict. Appellant was informed that the contempt order was prepared on August 9, 1975, and on August 12, 1975, was told that the court would hear a statement from him following the jury charge. The court again informed appellant that the contempt citation would be issued after the verdict.

On August 15, 1975, the court gave appellant the opportunity to speak on two occasions in his own behalf. First, after the jury was charged, the trial judge complimented all counsel including appellant who then presented a philosophical explanation to the court regarding non-violence and his strong emotional attachment to the case at bar. He candidly admitted his emotional state, his outspokenness, and his fervor for what he believed was correct. He did not deny the contemptuous statements.

The jury returned with its verdict and was discharged, whereafter the judge rendered his findings of fact and conclusions of law regarding the contempt. See *In re Paul,* 28 N.C.App. 610, 222 S.E.2d 479, 480–

481 (1976) for a full recitation of the findings. The court then found that appellant had disregarded the court's admonition not to continue to vocally criticize the court's rulings once rendered, had addressed the court in a loud, angry, and disrespectful manner, and indeed had even turned his back to the court and addressed the news media in the courtroom in a loud voice when, as above-quoted, appellant analogized the court to the tyrannical queen in *Alice in Wonderland.* The court also found that the statements were made in a disruptive manner and were an apparent attempt to force the court to declare a mistrial.

The trial judge nevertheless assured appellant that he harbored no personal animosity towards him, but that the contempt citation was necessary to preserve courtroom decorum and gave appellant a second opportunity to address the court. This colloquy centered again on the emotion of the trial, and constituted virtual acquiescence by appellant in the likely incarceration to follow which he designated as a "badge of honor."

[1] We agree with the Court of Appeals of North Carolina and the district court below that appellant's conduct clearly exceeded the bounds of vigorous advocacy. The conduct would have been disruptive absent the self-restraint exercised by the court. Appellant had been expressly warned by the judge not to continue his vocal criticisms of the court's rulings once rendered, yet persisted. We further agree with the Court of Appeals of North Carolina that the trial court did not "invite" appellant's disrespect. Nothing indicates that the court "badgered" or "provoked" appellant. To the contrary, appellant quite clearly informed the court that it would not "worry him" to be held in contempt. See *In re Paul,* 28 N.C.App. 610, 618–619, 222 S.E.2d 479, 484–485 (1976).

Appellant contends that his conduct constituted vigorous and effective advocacy constitutionally protected by the First, Fifth, Sixth, and Fourteenth Amendments. He argues that when the trial judge announced he was "busting up" [i. e. terminating the broad *voir dire* examination] that he did nothing more than respectfully request reconsideration by the court of that adverse ruling. Appellant adds that his conduct was effective advocacy since the court partially reversed its ruling on the scope of *voir dire* allowing certain questions to at least be asked, but not answered.

█ We find no constitutional infirmity in the contempt citation. If the trial court's ruling regarding the narrowing of the scope of permissible *voir dire* was unclear, the remedy was to seek clarification of the ruling at that time—not to continue to argue with the court after the ruling, express personal disgust with the very trial itself, and turn one's back on the court to make speeches to the news media in a loud, disrespectful and angry voice. Conduct of this nature has long been expressly condemned. *Maness v. Meyers,* 419 U.S. 449, 458–459, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *Sacher v. United States,* 343 U.S. 1, 9, 72 S.Ct. 451, 96 L.Ed. 717 (1952); See also: ABA Standards Relating to the Administration of Criminal Justice, The Defense Function § 7.1(a), (c) and (d) (Approved Draft, 1971).

## II.

## DUE PROCESS

█ Appellant contends that even if his conduct was contemptuous he did not receive adequate notice of the charges against him nor an opportunity to be heard prior to sentencing in violation of due process. As above-noted, appellant was given a verbatim transcript of the remarks the court found objectionable, was informed twice when the contempt citation would occur, and was also informed of and twice exercised his right to address remarks to the issue of contempt. The final speech by appellant came *after* the court had made findings of fact and conclusions of law regarding the contempt. Appellant at no time quarreled with the court's contempt finding, and at no time ever asked for a particularization thereof, but rather seemed to expect the citation and simply sought to

justify it on a philosophical basis. Due process was satisfied. *Taylor v. Hayes,* 418 U.S. 488, 498–499, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974). See also: *In re Meckley,* 137 F.2d 310 (3rd Cir. 1943).

## III.

## THE HEARING ISSUE

█ Appellant contends that where a direct contempt occurs in the presence of the court but the entry of the order is delayed until the conclusion of a trial, due process requires that a hearing be held *prior* to a determination that the acts in question are contemptuous. At most, appellant urges that he was accorded a hearing solely as to mitigation of punishment but not as to guilt or innocence.

As above-noted, appellant was given *two* opportunities to address the court regarding the contempt issue—after the jury retired, and then again after the verdict was returned and the court had rendered its findings of fact and conclusions of law. At neither hearing did appellant deny what had occurred nor did he seek to controvert the facts found by the trial court. No denial was registered that the conduct constituted legal contempt. Appellant apparently was content to rely upon his philosophical arguments to the court.

Postponing the hearings held on appellant's contempt citation until the conclusion of the trial coupled with notification of the charges against him and the dual opportunity given appellant to speak in his own behalf satisfied due process. A full scale trial was not required. *Taylor v. Hayes, supra,* at 498, 499, 94 S.Ct. 2697.

## IV.

## JUDICIAL DISQUALIFICATION

█ Appellant contends that the trial judge who found appellant in contempt had become "embroiled" in the controversy with appellant and was "prejudiced" against appellant since he had already found him "guilty" of the contempt prior to any hearings held. Therefore, he argues it was error for the judge not to recuse himself.

Both the Court of Appeals of North Carolina and the district court below found no evidence that the trial judge was "embroiled" in a controversy with appellant nor was the trial judge " . . . unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar v. Sarafite,* 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964); *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *In re Paul, supra,* 222 S.E.2d at 484. Compare: *Taylor v. Hayes, supra,* 418 U.S. at 501–504, 94 S.Ct. 2697. To the contrary, the trial judge was not only unbiased but also was complimentary of appellant's efforts at trial, commended him publically, and expressly based his contempt finding on the necessity for the preservation of "court decorum," and then only after appellant had made two statements of his position for the record.

With regard to the asserted "prejudice," under *Taylor v. Hayes, supra,* and *Sacher v. United States, supra,* a court may permissibly make a finding that a direct contempt occurred in the presence of the court, yet subject that finding to later reconsideration, as obviously occurred here when the contemnor exercises his right of allocution. We perceive no error in the conduct of the trial court.

The judgment of the district court is affirmed, and the case remanded to the district court for dissolution of the stay of execution of sentence.

*AFFIRMED.*

BUTZNER, Circuit Judge, dissenting:

I dissent because the procedure utilized to convict Jerome Paul of criminal contempt does not comport with the requirements of the due process clause. Paul was entitled to reasonable notice of the specific charges against him and to a hearing before an impartial judge. Since he was denied these fundamental rights, I would grant the writ of habeas corpus, conditioned on the right of the state to retry him within a reasonable time.

I

Paul was counsel for Joan Little, who was acquitted of murdering a prison guard. The incident on which the state chiefly relies to sustain Paul's conviction occurred during the examination of jurors at the start of the trial on July 15. One of the prospective jurors was a woman employed by the North Carolina Department of Corrections. She acknowledged that she had read about the case in the newspaper, but had not formed an opinion. Paul then questioned her about her reading habits, particularly as to magazines. The following colloquy ensued:

BY MR. PAUL FOR THE DEFENSE:

Q. All right, do you take any magazines?

MR. GRIFFIN [the prosecutor]: OBJECTION.

COURT: SUSTAINED. I'm going to have to get right down to—I will rule on every time you object.

Q. Do you read much?

A. Yes.

Q. All right, what do you read?

MR. GRIFFIN: OBJECTION.

COURT: OVERRULED.

A. Magazines and novels.

Q. What type of magazines?

MR. GRIFFIN: OBJECTION.

COURT: SUSTAINED.

MR. PAUL: If your Honor please, may I approach the bench.

COURT: Yes sir.

(Counsel approach bench)

COURT: I am just busting up your system right now. All right madam, will you go back in the jury room.

(NOTE: [Juror] returns to a jury room.)

COURT: All right, I'll hear you now.

MR. PAUL: If your Honor please, there is no reason that we should be bound to the traditional way of picking the jury.

COURT: Probably isn't, but that's exactly what we are going to do as from this minute on.

MR. PAUL: If your Honor please, to do that denies us due process and denies us the opportunity to effectively pick good jurors.

COURT: All right now do you want to put that in the records? I suppose you are taking that down (addressing court reporter).

MR. PAUL: We have developed a method of selecting the best jurors. For the Court to ignore the advances made in social sciences and other sciences, the aid in selecting fair jurors, is to return to a hundred years ago and makes absolutely no sense whatsoever.

COURT: I believe if it is necessary the Appellate Court has, in the last day, from you, a broad spectrum of your questions, you know, of what you're trying to do. I have my doubts—I had my doubts about it yesterday morning, but I wanted to give you full opportunity to present it, for possible appellate review. Now I want you to move to the Court, which you are now doing, that you be allowed to continue as you have started, which you are now doing.

MR. PAUL: That's what we're doing now.

COURT: All right, denied.

MR. PAUL: If your Honor please, any questions the State asks, they are allowed to ask. I think the Court has shown bias in this case in favor of the State.

COURT: All right, you can put that in the record.

MR. PAUL: And isn't giving us a fair trial.

COURT: All right, I'll let you put that in the record.

MR. PAUL: And there is no sense in the Court not allowing us to proceed in an orderly fashion when we have not disrupted the Court and we have not prolonged the examination. Our questions are only phrased in a little bit different way. Our questions take shorter time than the State's

do. The only difference is our questions are not traditional.

COURT: That's right.

MR. PAUL: And that being the only difference.

COURT: No, it is not that, because I think the record will disclose the type of questions and the length it has taken. I will let the record speak for that.

MR. PAUL: The time that we have kept on it shows the State has taken longer in examining jurors than we have.

COURT: I don't agree with that.

MR. PAUL: We have evidence that is has and that they have taken longer.

COURT: All right, anything else you want to say?

MR. PAUL: The only reason I can see that your Honor is now cutting us off is because we are gaining an advantage and your Honor is favoring the State and your Honor is proceeding in such a manner to insure Joan Little's conviction.

COURT: All right, you got that in the record.

MR. PAUL: And at this point we ask your Honor to recuse yourself because I don't think you are capable of giving Joan Little a fair trial and I don't intend to sit or stand here and see an innocent person go to jail for any reason and you can threaten me with contempt or anything else, but it does not worry me.

COURT: All right, you got that in the record.

MR. PAUL: And to sit there and say like the queen of hearts off with the heads because the law is the law is to take us back a hundred years.

COURT: All right.

MR. PAUL: And we intend to ask these questions. Now your Honor, they can object and you can sustain, but we intend to keep on asking the questions and in order for the appellate court to rule whether or not they were proper questions we have to ask the questions. It is apparent I'm quite disgusted with the whole matter, whole.

matter of ever bringing Joan Little to trial anyway. There has been one roadblock after another and one attempt after another to railroad Joan Little and I am tired of it. Now we intend to ask these questions and you can sustain the objections if you want to but the appellate court cannot make a ruling on whether or not they were proper questions unless the questions are asked.

COURT: All right, you have said that twice. I haven't said you couldn't ask the questions.

MR. PAUL: And the appellate courts cannot make a judgment on whether or not the questions would have been relevant unless they get the witness' answer into the record.

COURT: Well, I'll pass on that. Are you through?

MR. PAUL: I'm through for the moment but not through for this trial.

COURT: Yes sir. All right, let the jurors return to the courtroom.

The entire exchange took an estimated two and one-half minutes. At its conclusion, the court said nothing about citing Paul for contempt, and the selection of the jury resumed without further incident.

When the court convened the next day on July 16, the judge said:

Now, yesterday, we had an incident which occurred in which statements were made by Mr. Paul. The Court finds as a fact that the following took place at 2:55 p.m., on July 15th, which was yesterday; and this is called instance number one in reference to Mr. Paul and I am now handing him a record, verbatim record from the transcript of just what you said yesterday. Hand that to him. That's the only comment I'm making about it. (Transcript handed to Mr. Paul identical to pages 9–14 of this Record.)

The state court record discloses that five days later the judge advised Paul that after the jury returned its verdict, he would be "cited for contempt for his statements in court on July 15, 1975."

The state court record also recites:

On August 9, 1975, [the judge] prepared the Contempt Order, upon which Jerome Paul was eventually imprisoned, and informed Paul he was leaving blank the number of days that the said Paul would have to serve in jail for being in contempt of court by his actions on July 15, 1975. [The judge] retained the Contempt Order in his possession until it was read by him in open Court after the jury returned with a verdict of not guilty in the Joan Little case on August 15, 1975.

On August 12, 1975, [the judge] advised Jerome Paul privately in chambers that the Court would permit and hear a statement by the said Jerome Paul in open court following the jury charge in the Joan Little case if the said Jerry Paul desired to make a statement in open court at that time relating to his actions in court on July 15, 1975. During this conversation [the judge] further informed Jerome Paul that he would be held in contempt on the previously referred to Contempt Order immediately after the jury verdict in the Joan Little case

.   .   ..

On August 15, while the jury was considering its verdict, the trial judge offered Paul an opportunity to speak in his own defense. At this time, the only notice of any charges that Paul had received was the transcript of the incident that occurred during the selection of the jury on July 15. Responding to these charges, Paul made a rambling statement acknowledging that he had spoken emotionally, but asserting that he did not speak with hatred or anger or to belittle or harm the trial judge. At the conclusion of his statement, the trial judge complimented him, and said nothing further about punishing him for contempt.

After the jury returned its verdict later in the day, the trial judge disclosed, for the first time, the contents of the order that he had prepared the previous week. He prefaced his reading of the order with this statement:

I have a number of orders to enter; one involving Mr. Paul which I will enter at this time, and I'll give him a copy so he can follow me along. Haven't written in any amounts yet. That's for Mr. Paul.

Whereupon, the judge read the order holding Paul in contempt and sentencing him to jail. The order did not deal simply with the colloquy on July 15 during the selection of the jury. In addition, it adjudged Paul guilty of charges for which he had received no notice. For clarity, I have italicized these charges in the order below:

*The Court finds as a fact that during the first day of trial of the case of State vs. Joan Little, on the 14th day of July, 1975, the Court directed Mr. Jerry Paul, Chief Counsel for the defendant, Joan Little, to sit down three times before the said Paul did so after a ruling of the court to which the said Jerry Paul was vocally objecting. The court then admonished the said Jerry Paul that when a court ruled it was a ruling of the court and further statements of counsel critical of the ruling were not in order.*

The Court further finds as a fact that on the following day, July 15, 1975 at 2:55 o'clock p. m. when the court was hearing defense counsel, Jerry Paul, in the absence of the prospective juror Jenny Lancaster, in reference to the court's ruling on certain questions propounded to said juror by defense Jerry Paul. On that occasion Jerry Paul *in a very loud voice* stated that the court's rulings were denying the defendant an opportunity to effectively pick good jurors and to return to the method the court was suggesting was to return to a hundred years ago and made absolutely no sense whatsoever, at which time the court denied the defense counsel the right to ask certain questions in the manner put by defense counsel to which Jerry Paul answered *in a very loud voice* that any questions the state asked, they were allowed to ask, and the questions he wanted to ask were not being allowed to ask and that the court was showing bias in favor of the State and was not giving to the defense a fair trial. Thereafter, a conversation occurred between the court and the defendant as to the method of asking questions during which time defense counsel, Jerry Paul,

stated that the State was taking longer to examine jurors than the defense was taking.

*The Court further finds as a fact that this statement as to time consumed by the State was not true* at which time Jerry Paul answered that the reason the court was cutting him off was because the defendant was getting an advantage and the court was favoring the State and the court was proceeding in a manner to ensure Joan Little's conviction.

*The Court further finds as a fact that the records amply disclose that this was not a true statement* at which time the defense counsel, Jerry Paul, *in a voice indicating loud anger* asked the court to recuse himself because he didn't think that the court was capable of giving Joan Little a fair trial and he didn't intend to sit or stand there and see an innocent person go to jail for any reason and that the court could threaten him with contempt or anything else but it did not worry him, at which time *Attorney Jerry Paul instantly turned his back to the court and in a loud voice addressed the News Media and others in the courtroom* and said "and to sit there and say like the queen of hearts off with the heads, the law is the law, is to take us back one hundred years," whereupon *Attorney Jerry Paul then turned back to the court* and said that he intended to ask the questions and said *in a loud voice* "it is apparent I'm disgusted with the whole matter, whole matter of ever bringing Joan Little to trial anyway". Thereafter he made further statements and at the completion of these statements the court inquired if he was through he stated "I am through for the moment but not through for this trial."

The Court finds as a fact that the statements made by the said Attorney Jerry Paul on said occasion *were in manner made to disrupt the trial and in an apparent attempt to force the court at that time to find him in contempt of court in order that a mistrial would result.*

The Court concludes from the above findings of fact that the *above acts* of Jerry Paul as set forth in these Findings of Fact are in direct contempt of this court.

The Court further concludes that in order to keep this trial in progress which was necessary in the ends of justice, this order was delayed until the Joan Little trial had been completed.

Now, therefore, it is ordered, adjudged and decreed that the said Attorney Jerry Paul is in direct contempt of court and he is hereby ordered in punishment therefor to be confined in the common jail of Wake County for a period of fourteen days.

This the 15th day of August, 1975 and 12:10 p. m. o'clock. Signed by me.

Immediately after signing the order, the judge asked:

Now, Mr. Paul, you've got a little medical problem, is that bothering you?

MR. PAUL: Yes sir, that's correct.

THE COURT: When you want to start it, get it over as soon as—

MR. PAUL: If your Honor pleases, I would go ahead and get it over with. Could I make a statement?

THE COURT: Yes sir.

Paul then made a brief statement affirming his intense belief in the innocence of his client and emphasizing the necessity of his conduct "to make advances in courts and society." At the conclusion of his statement, the following proceedings took place:

THE COURT: All right. Thank you very much. Now, Mr. Paul realizes and I hope the News Media realizes that this is nothing personal between me as an individual and Mr. Paul because I personally have no animosity towards him whatsoever. This is a matter that I felt necessary in order to preserve the court decorum and I would have held him in contempt at that moment except we could not have tried the case—came at right time.

Now, you gentlemen can see me in chambers if you want to see—

MR. ROWAN [defense counsel]: No, sir. I believe going to have to be done in open court. .

At this time we move in arrest of judgment of the contempt that you have just issued against Mr. Paul.

THE COURT: Motion denied.

MR. ROWAN: Yes. Move for impartial judge.

THE COURT: Motion denied.

MR. ROWAN: And we move for a jury trial.

THE COURT: Motion denied. Now, I've got to see you about another matter.

## II

In this case, the trial judge found it unnecessary to invoke his power to maintain order in the courtroom by summarily punishing, without notice or hearing, contemptuous conduct committed in his presence. Since conviction and punishment were properly delayed until the conclusion of the trial, the case is governed by the principles expressed in *Taylor v. Hayes,* 418 U.S. 488, 496–500, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), and *Groppi v. Leslie,* 404 U.S. 496, 502–06, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972). These cases teach that "before an attorney is finally adjudicated in contempt and sentenced after trial for conduct during trial, he should have reasonable notice of the specific charges and opportunity to be heard in his own behalf." 418 U.S. at 498–99, 94 S.Ct. at 2703. The state court record discloses that Paul was denied these fundamental elements of due process.

Paul's only notice of the charges was given on July 16 when the trial judge, cryptically referring to "instance number one in reference to Mr. Paul," handed him a copy of the transcript containing the July 15 colloquy. Paul, however, was not convicted and punished solely for what he said in this colloquy. The order adjudicating his guilt states that the court also found him in contempt because he refused to be seated on July 14, he falsely charged that the state took longer to examine jurors than the defense, he addressed the court in a loud, angry voice, he turned his back on the court

to address the news media and others in the courtroom, and he acted with intent to create a mistrial. Since Paul was punished at least in part for these transgressions, the lack of notice about them denied him due process. *Taylor v. Hayes,* 418 U.S. at 500, 94 S.Ct. 2697.

Because of the insufficient notice, Paul was also denied an adequate hearing. When he made the statement before he was sentenced, he did not know what conduct the trial judge considered contemptuous other than his statements during the July 15 colloquy. Consequently, he was unable to offer any defense, explanation, or apology concerning the other charges. After he completed his statement, the trial judge read the contempt order with its additional charges, and, without affording him further opportunity to respond, sentenced him to jail.

Granting Paul permission to make a statement after he was sentenced was not a substitute for an adequate hearing before punishment was imposed. Both Paul and the judge clearly considered the proceedings concluded when Paul was convicted and sentenced. The finality of the proceedings is confirmed by the judge's summary denial of the defense motions without even hearing arguments on their merits. Nothing in the record suggests that the judge was willing to reopen the case. Thus, the contempt proceeding violated due process because Paul was denied "an opportunity to be heard in defense before punishment [was] imposed." *Taylor v. Hayes,* 418 U.S. at 498, 94 S.Ct. at 2703, *quoting Groppi v. Leslie,* 404 U.S. at 502, 92 S.Ct. 582.

The ABA Standards Relating to the Function of the Trial Judge § 7.4 (App. Draft 1972) provide:

Before imposing any punishment for criminal contempt, the judge should give the offender notice of the charges and at least a summary opportunity to adduce evidence or argument relevant to guilt or punishment.

I believe that these recommendations succinctly state the minimal requirements of

due process. *See Taylor v. Hayes,* 418 U.S. at 499 n.8, 94 S.Ct. 2697. Tested by this construction of the due process clause, Paul's conviction cannot stand.

### III

Furthermore, Paul was entitled to a hearing before another judge. In contempt proceedings, a judge exercises power unmatched by any other public official; he alone acts as prosecutor, witness, and adjudicator. Recognizing that this authority must be tempered with calm detachment, the Supreme Court has held that another judge should conduct contempt proceedings when (a) the trial judge becomes embroiled in a controversy with the contemnor, or (b) the contemnor personally attacks the trial judge. *Taylor v. Hayes,* 418 U.S. at 501–03, 94 S.Ct. 2697; *Mayberry v. Pennsylvania,* 400 U.S. 455, 463–66, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). Each reason sustains Paul's claim for the appointment of a substitute judge.

The trial judge became personally embroiled in the controversy over Paul's method of jury selection when he announced at the beginning of the bench conference, "I am just busting up your system right now." The judge's attitude toward Paul was further revealed when he told Paul on August 12, before hearing his defense, that Paul would be held in contempt when the jury returned its verdict. These remarks indicate a lack of the fair and impartial adjudication that *Taylor* seeks to preserve.

Even if the trial judge were not disqualified because of his own conduct, a substitute judge would be required because of Paul's personal attack on the judge. In response to the trial judge's announcement about "busting up" his system, Paul charged that the ruling showed bias. He accused the judge with proceeding so as to assure the defendant's conviction and demanded that he recuse himself because of his inability to conduct a fair trial. He then likened the judge to the Queen of Hearts, saying "off with the heads," and he referred to one attempt after another "to railroad" the defendant.

In the face of this attack, the trial judge exercised commendable restraint. The Supreme Court, however, has held that, regardless of the judge's reaction, a substitute judge is required when the contemnor makes "an insulting attack upon the integrity of the judge." *Mayberry v. Pennsylvania,* 400 U.S. at 465, 91 S.Ct. at 505, *quoting Ungar v. Sarafite,* 376 U.S. 575, 584, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Paul's accusation that the judge would assure the defendant's conviction because of his bias against her was an attack upon the judge's impartiality and integrity. *United States v. Meyer,* 462 F.2d 827, 844–45 (D.C.Cir. 1972). Indeed, the state itself insists that Paul's remarks were an insulting attack on the judge. Therefore, the contempt charges, which were based in part on these remarks, should have been tried by another judge in order to conform with the standards of due process prescribed by *Mayberry,* 400 U.S. at 465, 91 S.Ct. 499.

It may well be that the trial judge had no actual bias and that he acted with complete impartiality. Even so, he should have recused himself. Addressing this problem, the Supreme Court has said:

> [T]he inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was "such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties," but due process of law requires no less. . . . *Taylor v. Hayes,* 418 U.S. at 501, 94 S.Ct. at 2704.

I do not condone Paul's conduct. The ability of our adversary system to achieve justice is dependent, in part, upon the courtesy, dignity, and decorum of trial lawyers. Nevertheless, the constitutionality of Paul's conviction depends on proof of an imminent threat to the administration of justice. *In re Little,* 404 U.S. 553, 555, 92 S.Ct. 659, 30

L.Ed.2d 708 (1972). Because Paul was denied procedural due process, his guilt cannot be determined on the basis of the record before us. I believe the writ should issue, conditioned on Paul being granted a hearing before another judge after reasonable notice of the specific charges against him.