Barry NAKELL, Petitioner–Appellant,

v.

ATTORNEY GENERAL OF NORTH CAROLINA, Respondent–Appellee.

North Carolina Academy of Trial Lawyers; North Carolina Civil Liberties Union–Legal Foundation, Amici Curiae.

No. 92–6226.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 29, 1993.

Decided Jan. 27, 1994.

**ARGUED:** Norman Barrett Smith, Smith, Follin & James, Greensboro, NC, for Appellant. Clarence Joe DelForge, III, Asst. Atty. Gen., Raleigh, NC, for Appellees. **ON BRIEF:** Michael F. Easley, Atty. Gen. of North Carolina, Raleigh, NC, for Appellees. Robert P. Mosteller, Duke Law School, Durham, NC, for Amici Curiae.

Before ERVIN, Chief Judge, and MURNAGHAN and WILKINS, Circuit Judges.

## OPINION

ERVIN, Chief Judge:

Barry Nakell was convicted of criminal contempt in the Superior Court of Robeson County, North Carolina before Judge I. Beverly Lake, Jr. on November 16, 1989. Nakell has both paid the $500 fine and served the 10 day jail sentence imposed by Judge Lake. After exhausting all available state court remedies, Nakell filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. Nakell appeals from the district court's denial of the petition.

The issues on appeal are (1) whether Nakell's unconditional release from custody renders his appeal moot, (2) whether the evidence was sufficient to support Nakell's conviction, and (3) whether Judge Lake's summary contempt proceeding violated Nakell's due process rights.

We find that because Nakell may suffer collateral legal consequences resulting from his conviction, his appeal is not moot. The evidence, however, was sufficient to support

Nakell's conviction and his due process rights were not violated by Judge Lake's proceeding. The district court's denial of Nakell's petition for a writ of habeas corpus is affirmed.

## I.

Barry Nakell, a North Carolina attorney, was convicted in state court on direct criminal contempt charges and sentenced to ten days imprisonment and a $500 fine. The charges arose from a contentious pre-trial hearing concerning the legal representation of Eddie Hatcher, a controversial defendant whose kidnapping case had engendered substantial publicity.

At Hatcher's first courtroom appearance, he was represented by Nakell on limited appearance and by Ronald Kuby, a New York attorney appearing *pro hac vice*. Kuby and William Kunstler, another New York attorney, were later admitted *pro hac vice* to represent Hatcher in association with a court-appointed attorney. Subsequent orders concerning Hatcher's representation were made at later hearings which in effect provided that only court-appointed counsel would be recognized on Hatcher's behalf.

On November 14, 1989, Judge Lake began the hearing in question by reviewing three of these orders.* One order appointed the public defender to represent Hatcher. A second order denied eligibility of Kunstler and Kuby to appear *pro hac vice*. A third order prevented Hatcher from dismissing the public defender until the court received a writing from Hatcher stating that he wanted to proceed *pro se*. The orders created ambiguity concerning the status of Nakell. Judge Lake clearly considered the previous order recognizing only the public defender as counsel for Hatcher to be controlling.

As Judge Lake was preparing to consider the issue of Hatcher's *pro se* representation, Nakell asked to be heard by the court. Judge Lake denied Nakell's request. Nakell interrupted the court again to try to clarify the issue of Hatcher's representation. Judge

Lake informed Nakell that his notice of limited appearance was not in conformity with the order recognizing the public defender, Angus Thompson, as the only attorney of record in the case. Judge Lake told Nakell that he would not be heard. Nakell continued to present his views and Hatcher also interrupted with obscene outbursts. The judge instructed Nakell to sit down and warned either Nakell or Hatcher (it is unclear whom the judge was addressing) that he would be removed from the courtroom if he continued to interrupt. Nakell continued to state his argument and the judge said "I said sit down, Mr. Nakell. That's a direct order from the court." Nakell continued to address the court and Judge Lake said "Do you want to be held in direct criminal contempt of this court?" After several further interruptions by Nakell and Hatcher, the judge told Nakell that "I am directing you specifically to sit down and be quiet." When Nakell further insisted on addressing the question of Hatcher's representation, after several additional admonitions by the judge, the judge finally said to Nakell "Well, let me see if I can make you understand, Mr. Nakell. I am denying your request for a limited appearance on behalf of this defendant and I'm directing you to sit down and be quiet and not say another word to the court except if you want to say something, do it through Mr. Thompson." Nakell then turned to Mr. Thompson and in the same tone of voice used to address the court, said, "All right. Mr. Thompson, would you inquire about the basis—legal basis for [prohibiting] a licensed North Carolina attorney from appearing on behalf of a defendant in a criminal case in association with a public defender." The audience applauded. Hatcher continued to interrupt with obscene outbursts attacking the judge. At that point, Judge Lake directed the bailiff to remove Nakell from court and Hatcher threw a pen at the judge.

At the end of the hearing, the judge ordered Nakell to return to the courtroom and specified the contempt charges, including refusing to sit down when ordered to do so, refusing to be quiet, being disruptive of the

---

* It should be noted that all of these orders were entered by superior court judges other than Judge Lake.

proceedings, unduly prolonging the proceedings, pandering to the audience and encouraging defendant Hatcher to be disruptive. The judge ordered Nakell to return two days later, with counsel if he desired, for further consideration of the matter. Nakell requested more time but that plea was denied.

Judge Lake later approached several court personnel and asked them to provide affidavits of the preceding events. The judge also responded to a telephone call from a newspaper reporter by stating that Nakell had been disruptive.

At the contempt hearing on November 16, Nakell requested through his attorney that the case be continued so as to be placed before another judge. Judge Lake denied the request. The judge stated that "this is a continuing hearing." He was "continuing to proceed summarily" and he noted "As I said, this is a summary proceeding." The judge provided copies of the affidavits he had procured to Nakell and his counsel. Four witnesses testified at the hearing. Nakell testified that he had not intended to disrupt the proceedings but only to clarify the issue of Hatcher's representation. He did testify, however, that it was clear to him that the court was ruling that he should not appear in the case. Judge Lake found that Nakell willfully interrupted the proceedings of the court and encouraged Hatcher to be disruptive. Nakell was convicted of direct criminal contempt of court and sentenced to 10 days in jail and a $500 fine.

## II.

■ Nakell's unconditional release from custody after serving his ten day sentence in the Robeson County jail raises the issue of whether this petition for habeas corpus has become moot. Generally, a case becomes moot when the issues presented are no longer "live" or the parties lack a "legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980)). Two exceptions to the mootness doctrine include cases where collateral consequences give a sufficient stake in the outcome and cases where the underlying factual predicate is capable of repetition yet evading review. *Leonard v. Hammond,* 804 F.2d 838, 842 (4th Cir.1986) (citations omitted).

In *Carafas v. La Vallee,* 391 U.S. 234, 237, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554 (1968) (quoting *Fiswick v. United States,* 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 (1946)), the Supreme Court held that certain disabilities or burdens which may flow from petitioner's conviction gave him a " 'substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed.' " Because of these " 'collateral consequences,' " the case was not moot. *Carafas,* 391 U.S. at 237–238, 88 S.Ct. at 1559 (quoting *Ginsberg v. New York,* 390 U.S. 629, 633–34 n. 2, 88 S.Ct. 1274, 1277 n. 2, 20 L.Ed.2d 195 (1968)). The disabilities the Court was considering included being unable to engage in certain businesses, serve as an official of a labor union, vote in any New York State election or serve as a juror. *Carafas,* 391 U.S. at 237, 88 S.Ct. at 1559.

A possible refund of a fine has also been held a collateral consequence constituting a sufficient stake in the outcome to prevent mootness. In *Richmond Black Police Officers Ass'n v. Richmond,* 548 F.2d 123, 129 (4th Cir.1977), this court held that "although the fines have been paid, the case is not moot because the district judge levied the fines to be paid immediately subject to refund upon appellate reversal . . . ." Similarly, in *Port v. Heard,* 764 F.2d 423, 427 (5th Cir.1985), "the fine, as a direct consequence of the contempt convictions, preserves the Ports' stake in the merits of the appeal they bring before us, despite their release from custody." Nakell has produced as part of his Reply to Respondent's Supplemental Brief an affidavit from the records maintenance manager of the North Carolina courts stating that it is the customary procedure of North Carolina courts to refund fines upon receiving notice that a conviction has been overturned. Nakell's interest in the return of the $500 fine is a collateral consequence sufficient to prevent mootness.

Nakell further argues that because he is an attorney, he will suffer the collateral con-

sequence of possible disciplinary proceedings as a result of his contempt conviction. In *Richmond Black Police Officers Ass'n*, the court stated that additional collateral consequences, beyond the possibility of the refund of the fines, also prevented the case from becoming moot. In particular, the court noted that one of the defendants was an attorney who faced "possible disciplinary proceedings" if his conduct was found to violate applicable guidelines. *Richmond Black Police Officers Ass'n*, 548 F.2d at 129. Likewise, in *In re Kave*, 760 F.2d 343, 353 n. 20 (1st Cir.1985), the court found that despite the fact that the district court had set aside the imposition of fines, the appeal was not moot because, in addition to other consequences, the defendant attorney might face disciplinary charges. Although the North Carolina State Bar has dismissed a grievance against Nakell based on this conviction, Nakell contends that the grievance may be revived. This possibility serves as an additional collateral consequence preventing mootness.

The Attorney General argues that this case is similar to *Broughton v. North Carolina*, 717 F.2d 147 (4th Cir.1983), *cert. denied*, 466 U.S. 940, 104 S.Ct. 1917, 80 L.Ed.2d 464 (1984), in which a misdemeanor contempt conviction was found to possess no significant collateral consequences and was not capable of repetition yet evading review so that release from custody rendered the appeal moot. In that case, however, no fine was imposed and the petitioner was a layperson not subject to professional discipline. The case at bar presents circumstances that distinguish it from *Broughton*. Because of the collateral consequences associated with Nakell's conviction, his appeal is not moot.

◼ Following oral argument in this case, the Attorney General submitted a motion to dismiss the appeal due to lack of jurisdiction, arguing that because the appeal is moot, this court lacks jurisdiction. We have found that Nakell's appeal is not moot and therefore the motion is denied. It bears noting, however, that the question of mootness is separate and distinct from the jurisdictional issue. *Leonard*, 804 F.2d at 842. The federal habeas corpus statute requires that plaintiffs must be in custody when the application for habeas is filed. *Id.* Once federal jurisdiction is thus established, plaintiffs' subsequent releases have no effect on that jurisdiction. *Id.*

Nakell filed his petition for habeas corpus while released on his own recognizance on the day he later began serving his sentence. The Supreme Court has held that a person released on his own recognizance is "in custody" within the meaning of the federal habeas corpus statute, 28 U.S.C. §§ 2241(c), 2254(a). *Hensley v. Municipal Court*, 411 U.S. 345, 345–46, 351–53, 93 S.Ct. 1571, 1572, 1574–76, 36 L.Ed.2d 294 (1973). Because Nakell was in custody when he filed his petition, federal jurisdiction attached and is not affected by his subsequent release.

### III.

In a habeas corpus action, the standard of review of the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in the original). This court has held that review "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982).

◼ To find direct criminal contempt there must be a contemptuous act committed within the sight or hearing of a presiding judicial official in or in immediate proximity to the room where proceedings are being held that is likely to interrupt or interfere with matters then before the court. N.C.Gen.Stat. § 5A–13 (1986). A contemptuous act includes, among others, willful behavior committed during the sitting of a court and directly tending to interrupt its proceedings; willful behavior committed during the sitting of a court in its immediate view and presence and directly tending to impair the respect due its authority; and willful disobedience of, resistance to, or interference with

a court's lawful process, order, directive, or instruction or its execution. N.C.Gen.Stat. § 5A–11 (1986).

■ A rational trier of fact could find that Nakell willfully disobeyed a lawful order of the court within sight of a presiding judge in proximity to the hearing in a manner that was likely to interrupt the matters before the court. Although Nakell contends that he did not intend to disrupt the proceedings, he in fact deliberately disobeyed Judge Lake's repeated orders to sit down and be quiet. All that is required for willful behavior is a " 'volitional act done by one who knows or should reasonably be aware that his conduct is wrongful.' " *United States v. Warlick,* 742 F.2d 113, 117 (4th Cir.1984) (quoting *United States v. Marx,* 553 F.2d 874, 876 (4th Cir. 1977)). While it is unlikely that Nakell intended any insult or injury to the court, he nonetheless consciously disobeyed direct orders in circumstances that were made additionally contentious because of Hatcher's violent behavior. Given Hatcher's repeated outbursts and violent tendencies, regardless of whether caused by Nakell, Judge Lake may have felt a need to maintain order even more acutely than under more normal circumstances. Judge Lake's admonitions to Nakell were unambiguous and Nakell chose to ignore them.

Nakell makes numerous contentions that his actions were justified because the legal position he was espousing was correct. His conclusion does not follow from his premise. Regardless of whether his arguments were correct, it was inappropriate for him to present them to the court when he clearly understood that the court did not recognize him as Hatcher's counsel. *Walker v. Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) (holding that invalidity of trial court's order not a defense in contempt proceeding for disobedience of that order); *Howat v. Kansas,* 258 U.S. 181, 189, 42 S.Ct. 277, 280, 66 L.Ed. 550 (1922) (stating that "the error was subject to correction only by the ordinary method of appeal, and disobedience to the order constituted contempt").

Because a rational trier of fact could find the elements of direct criminal contempt beyond a reasonable doubt, Nakell's insufficiency of the evidence claim must fail.

IV.

Nakell's claim that his due process rights were violated in the course of the summary contempt proceeding flows from the alleged personal bias of Judge Lake. Judicial bias should be treated as a mixed question of law and fact subject to *de novo* review. *Sandstrom v. Butterworth,* 738 F.2d 1200, 1207 (11th Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 787, 83 L.Ed.2d 781 (1985). Furthermore, the Supreme Court has "justified independent federal or appellate review as a means of compensating for 'perceived shortcomings of the trier of fact by way of bias or some other factor.' " *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985) (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 518, 104 S.Ct. 1949, 1969, 80 L.Ed.2d 502 (1984)).

■ Nakell's due process claim is based on two issues: (1) whether because the contempt hearing was delayed for two days, the proceeding should have been conducted in a plenary rather than summary fashion and (2) whether because Judge Lake allegedly became personally embroiled in the controversy, Nakell was entitled to a hearing by a different judge.

> The Supreme Court has held that "summary" . . . does not refer to the timing of the action with reference to the offense but refers to a procedure which dispenses with the formality . . . that goes with a conventional court trial. . . . Reasons for permitting straight-way exercise of summary power are not reasons for compelling or encouraging its immediate exercise." *Sacher v. United States,* 343 U.S. 1, 9–10, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952).

The Court held that delay of summary proceedings was within the discretion of the trial judge when she deemed immediate action inexpedient. *Sacher,* 343 U.S. at 10, 72 S.Ct. at 455–56. Similarly, in *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), the Court affirmed a contempt pro-

ceeding claimed by the petitioner to be summary that was held seven days after the end of the trial in which the contemptuous behavior occurred. The Court found that the requirements of due process were met because the petitioner was afforded notice and an opportunity to be heard. This court has also found delayed summary contempt proceedings to be consistent with due process. See *Paul v. Pleasants*, 551 F.2d 575 (4th Cir. 1977), *cert. denied*, 434 U.S. 908, 98 S.Ct. 310, 54 L.Ed.2d 196 (1977).

Because Nakell was accused of direct criminal contempt, Judge Lake could have held this summary proceeding on the day when the contemptuous acts occurred. Nakell would have been denied any delay and would not have had the opportunity to obtain counsel. Instead, Nakell had time to prepare his case. Judge Lake did not deny Nakell due process by delaying the summary contempt proceeding for two days.

That Nakell was not afforded more time to prepare does not alter this finding.

> The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Ungar*, 376 U.S. at 589, 84 S.Ct. at 849.

Nakell appeared at his contempt proceeding represented by counsel, questioned witnesses and personally took the stand. Nakell was afforded notice and an opportunity to be heard.

■ Nakell further contends that Judge Lake should have recused himself from the contempt proceedings. When contemptuous conduct has personally attacked or provoked a judge so as to embroil her in a personal controversy with the defendant, the judge should excuse herself from the contempt proceedings. *Taylor v. Hayes*, 418 U.S. 488, 501, 94 S.Ct. 2697, 2704–05, 41 L.Ed.2d 897 (1974). However, "there is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *In Re Union Leader Corp.*, 292 F.2d 381, 391 (1st Cir.1961), *cert. denied*, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961). Because the acts in question are within the personal knowledge of the judge, that judge should preside whenever possible. "In sum, a judge must be presumed to be qualified, and there must be a substantial burden upon the affiant to show grounds for believing the contrary." *Id.* at 389.

■ Nakell made no personal attacks on Judge Lake. He addressed only legal issues at Hatcher's hearing, albeit in violation of direct court orders not to do so. The Supreme Court has been "unwilling to bottom a constitutional rule of disqualification solely upon such disobedience to court orders and criticism of its rulings during the course of a trial." *Ungar*, 376 U.S. at 584, 84 S.Ct. at 847. Nakell's claim that Judge Lake became embroiled with Hatcher are irrelevant.

■ Nakell finally claims that Judge Lake's request for affidavits from court personnel and his interview with a news reporter regarding the contempt charges indicate personal bias. As noted by the district court, this type of activity is "not a wise judicial activity" but does not indicate the type of personal bias that would require Judge Lake to recuse himself nor did it render the contempt proceeding unfair.

Because it was not a violation of due process to delay the summary contempt proceeding two days and because Judge Lake did not become personally embroiled with the petitioner, Nakell's due process claim must fail.

### V.

The judgment of the district court is therefore affirmed.

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting:

I write only on the question of whether Nakell was entitled to a contempt hearing before a judge other than Judge Lake.

Supreme Court precedent teaches that another judge should conduct contempt proceedings when (1) the trial judge is personally attacked by the contemnor; or 2) the trial judge becomes embroiled in a controversy

with the contemnor. *Taylor v. Hayes*, 418 U.S. 488, 501–03, 94 S.Ct. 2697, 2704–06, 41 L.Ed.2d 897 (1974); *Mayberry v. Pennsylvania*, 400 U.S. 455, 463–466, 91 S.Ct. 499, 504–05, 27 L.Ed.2d 532 (1971). Since I believe that following either *Taylor* or *Mayberry* Judge Lake should have recused himself from the contempt hearing, I dissent.

The majority relies on the fact that the personal attack upon Judge Lake was launched not by the contemnor (appellant Nakell) but by his client (Hatcher), and thereby suggests that the "personal attack" doctrine does not apply. The majority's reliance on this apparent distinction is misplaced, however, because Judge Lake held Nakell responsible for the attack and repeatedly and explicitly charged Nakell with directly causing and encouraging his client's conduct—and it is Judge Lake's interpretation of the events and his possible personal bias which are at issue here.

In his specification of the contempt charges, on November 14th, the judge stated: "It appeared clear to the Court that you were pandering to the audience and to the defendant and that *you were encouraging the defendant, Eddie Hatcher, to be disruptive.*" J.A. 89 (emphasis added). The judge reiterated the point in his interview with a *Raleigh News and Observer* reporter, *see* J.A. 99–100, and again when rendering his findings of fact on November 16th. *See* J.A. 192 (finding by Judge Lake that Nakell's behavior "was the *direct cause* of Mr. Hatcher's behavior in exceeding his previous attacks on the Court by his language and launching into a violent attack upon the Court" (emphasis added)); *id.* at 196 (concluding "from the Court's direct observation that Mr. Nakell's conduct *incited* that eruption [and] exacerbated that highly volatile situation" (emphasis added)).

Whether Nakell's allegedly contemptuous conduct *in fact* caused Hatcher to launch a personal attack on Judge Lake is irrelevant here. The Supreme Court addressed its personal attack doctrine to the bias, or appearance of bias, of the judge; even if it could be somehow proved with certainty that Nakell *did* encourage and directly cause Hatcher's tantrum, that fact would have no bearing on the issue of Judge Lake's possible bias

against Nakell. His bias against Nakell could be quite strong even if it were based upon a faulty understanding of what inspired Hatcher's misconduct. This court properly should impute Hatcher's personal attack on Judge Lake to Nakell precisely because Judge Lake himself so imputed it. Thus, the personal attack on Judge Lake that occurred at the November 14th hearing required a recusal. By adjudicating the contempt himself, Judge Lake violated Nakell's due process rights under the Fourteenth Amendment. Therefore, the Fourth Circuit should grant Nakell's petition for a writ of habeas corpus. That by no means, relieves Nakell of a need to litigate the question of contempt. It would only assure his constitutional right of an impartial judge.

Furthermore, as the Supreme Court has explained, even if the "contemptuous conduct [falls] short of personal attack, [it] may still provoke a trial judge and so *embroil him in controversy* that he cannot 'hold the balance nice, clear and true between the State and the accused.'" *Taylor*, 418 U.S. at 501, 94 S.Ct. at 2704 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927)) (emphasis added); *see also* 3 Charles Alan Wright, *Federal Practice and Procedure: Criminal 2d* § 713, at 863–64 (2d ed. 1982) ("If this is so, another judge must try the contempt charge.") (citing *inter alia Taylor*, 418 U.S. at 501–02, 94 S.Ct. at 1921–22).

"In making this ultimate judgment, the inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.'" *Taylor*, 418 U.S. at 501, 94 S.Ct. at 2704 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)). " 'Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less." *Id.* (quoting *In re*

Murchison, *349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)).\*\**

Unlike the "personal attack" doctrine applied above, the line of due process cases dealing with judges' "embroilment" requires an appellate court to review both the contemnor's conduct *and* the judge's response to that conduct. *See Taylor*, 418 U.S. at 503 n. 10, 94 S.Ct. at 2705–06 n. 10.

An examination of the record before us leaves little doubt that Judge Lake became personally embroiled in a running controversy with Nakell and Nakell's client. The evidence regarding Nakell's conduct (and Hatcher's conduct, to the extent that the judge held Nakell responsible for it) has been reviewed above. Judge Lake's response to Nakell's conduct also suggests that the judge had become embroiled in a running controversy with Nakell and Hatcher. Between the hearings of November 14th and 16th, Judge Lake granted an interview to the *Raleigh News and Observer*, in which he flatly stated that " 'Mr. Nakell had been disruptive of the proceedings, pandering to the audience and the defendant and encouraging Mr. Hatcher to be disruptive.'" J.A. 99–100 (quoting the newspaper article). At the November 16th hearing, the judge acknowledged the interview and the accuracy of the quotation. *See* J.A. 100.

The words of the article, fairly read, appear to be preliminary conclusions of fact, not mere recitations of the charges. Judge Lake conveyed these statements to the press *before* he sat in judgment on the contempt charge. Neither the public nor any defendant can remain confident in the impartiality of a tribunal when the tribunal itself has already convicted the defendant in the press. *See McClendon v. Clinard*, 38 N.C.App. 353, 247 S.E.2d 783, 784–85 (1978) (reversing a trial judge's dismissal of a motion to recuse, in part because the judge had given an interview to a reporter about an incident involving the plaintiffs' attorney); *Suter v. State*, 588 P.2d 578, 580–81 (Okla.Crim.App.1978) (holding that a contempt proceeding should have been conducted before a different judge in

part because the magistrate gave an interview to a newspaper before the final contempt proceeding); *cf. Ungar*, 376 U.S. at 587–88, 84 S.Ct. at 848–49. Judge Lake's press statement created at least the appearance that he was so personally embroiled in the controversy as to compromise his impartiality, and therefore the Due Process Clause mandated a recusal. *See Taylor*, 418 U.S. at 501, 94 S.Ct. at 2704–05. Because Judge Lake was both personally attacked and embroiled in controversy with Nakell, his bias— or at least appearance of bias—warrants the granting of Nakell's petition for the writ of habeas corpus.

Therefore, I respectfully dissent.

\*\* Given the Supreme Court's teaching of the appropriateness of a judge's recusal in circumstances such as those presented by the instant case, *In Re Union Leader Corp.*, 292 F.2d 381 (1st Cir.1961), decided by the First Circuit a decade before *Mayberry* and *Taylor* and relied on by the majority, seems a slim reed indeed.