# TAYLOR v. HAYES, JUDGE

No. 73–473.   Argued March 18, 1974—Decided June 26, 1974

*Robert Allen Sedler* argued the cause for petitioner. With him on the briefs were *Doris Peterson* and *Morton Stavis.*

*Henry A. Triplett* argued the cause and filed a brief for respondent.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The question in this case concerns the validity of a criminal contempt judgment entered against petitioner by reason of certain events occurring in the course of a criminal trial in the courts of the Commonwealth of Kentucky. Petitioner was retained counsel for Narvel Tinsley, a Negro, who along with his brother Michael was

---

*Briefs of *amici curiae* urging reversal were filed by *Burke Marshall, Leon Friedman,* and *Norman Dorsen* for the Association of the Bar of the City of New York; by *Frank E. Haddad, Jr., Joe G. Leibson,* and *Ed P. Jackson* for the Louisville Bar Assn.; by *James Larson, Arthur Kinoy,* and *Victor Rabinowitz* for the National Lawyers Guild; and by *Melvin L. Wulf* for the American Civil Liberties Union.

charged with the murders of two police officers. According to the Kentucky Court of Appeals, the "murders created some considerable sensation in Louisville . . . and . . . newspaper coverage was overly abundant." 494 S. W. 2d 737, 739 (1973). Trial before respondent trial judge began on October 18, 1971, and was completed on October 29.

On nine different occasions during this turbulent trial, respondent, out of the hearing of the jury and most often in chambers, informed petitioner that he was in contempt of court. The first charge was immediately reduced to a warning and no sentence was imposed at the time of charge in that or any other instance. Petitioner was permitted to respond to most, but not all, of the charges.[1]

At the conclusion of the trial on October 29 and after a guilty verdict had been returned, respondent, in the presence of the jury, made a statement concerning petitioner's trial conduct. Refusing petitioner's request to respond and declaring that "I have you" on nine counts, respondent proceeded to impose a jail term on each count totaling almost four and one-half years: 30 days on the first count, 60 days on the second, 90 days on the third, six months on counts four, five, six, and seven, and one year each on counts eight and nine, "all

---

[1] When for the sixth time petitioner was informed that he was in contempt, he sought to reply and was informed he could do so at the next recess. Nothing more appears in the record with respect to this episode. On the seventh occasion, petitioner undertook to respond but respondent left the chambers, and any further discussion of this charge was apparently ordered excluded from the record by respondent. Petitioner was denied the right to respond when he was informed of the eighth charge of contempt. As far as the record shows, there was neither a request to respond nor denial of response in connection with the ninth contempt charge.

to run consecutive."[2]    A few days later, petitioner was also barred from practicing law by respondent in his division of the Criminal Branch of the Jefferson Circuit Court.

---

[2] The following is the complete transcript of the proceedings on October 29, 1971, with respect to the contempt charges against petitioner:

"The Court: Mr. Taylor, the Court has something to take up with you sir, at this time.

"Mr. Taylor: Well, I'll be right here, Judge.

"The Court: I've for two weeks sit here and listen to you.  Now, you're going to listen to me.  Stand right here, sir.

"For two weeks I've seen you put on the worst display I've ever seen an attorney in my two years of this court and 15 years of practicing law.  You've quoted that you couldn't do it any other way.  You know our court system is completely based upon, particularly criminal law, the Doctrine of Reasonable Doubt.  That's exactly what it means, reason.  It doesn't mean that it's based upon deceit; it doesn't mean that it's based upon trickery; it doesn't mean it's based upon planned confusion.

"Sometimes I wonder really what your motive is, if you're really interested in the justice of your client, or if you have some ulterior motive, if you're interested in Dan Taylor or Narvel Tinsley.

"It's a shame that this court has to do something that the Bar Association of this State should have done a long time ago.

"As far as a lawyer is concerned, you're not.  I want the jury to hear this; I want the law students of this community to hear this, that you're not the rule, you're the exception to the rule.——

"Mr. Taylor: (Interrupting) Thank you.

"The Court: I want them to understand that your actions should not be their actions because this is not the way that a court is conducted.  This is not the way an officer of a court should conduct itself.

"Mr. Taylor: I would respond to you, sir——

"The Court: (Interrupting) You're not responding to me on anything.

"Mr. Taylor: (Interrupting) Oh yes, I will.

"The Court: Yes, you're not, either.

"Mr. Taylor: Yes, I will.

[*Footnote 2 is continued on p. 492*]

While petitioner's appeal was pending, on March 2, 1972, respondent entered a corrected judgment containing a "certificate" which described the nine charges of contempt [3] but eliminated the first charge as having been

"The Court: The sentence is on Count One——

"Mr. Taylor: (Interrupting) Unless you intend to gag me——

"The Court: (Interposing) I'll do that——

"Mr. Taylor: (Interposing) My lawyers will respond to you——

"The Court: (Interposing) I'll do that, sir.

"Mr. Taylor: My lawyers will respond to you, sir.

"The Court: You be quiet, or you'll—there will be some more contempts——

"Mr. Taylor: (Interrupting) No, you heard what I said.

"The Court: I have you nine counts. First Count, 30 days in jail; Second Count, 60 days in jail; Third Count, 90 days in jail; Fourth Count, six months in jail; Fifth Count, six months in jail; Sixth Count, six months in jail; Seventh Count, six months in jail; Eighth Count, one year in jail; Ninth Count, one year in jail, all to run consecutive.

"Take him away.

"Mr. Taylor: We will answer you in court.

"The Court: I'd be glad to see you." App. 28–29.

[3] The nine charges of contempt were described in the certificate as follows:

*"Contempt 1.* Mr. Taylor, in questioning a prospective juror, on the second day of Voir Dire, repeatedly ignored the Court's order not to continue a certain line of questioning and to ask his questions of the jury as a whole, He evidenced utter disrespect for prospective jurors (T. E. 335–347).

*"Contempt 2.* The court sustained the Commonwealth objection on the use of a prior statement to cross examine Officer Hogan and not to go into the escape of Narvel Tinsley. Mr. Taylor repeatedly and completely ignored the court's ruling (T. E. 1071–1080).

*"Contempt 3.* During the playing of a tape recording of the voice of witness David White, Mr. Taylor wrote on a blackboard. After the playing of the tape it was ordered that the blackboard be removed from the court and Mr. Taylor was advised by the court that he could use it in his final summation to the jury. Mr. Taylor

reduced to a warning and reduced the sentence on each of the last two counts to six months in jail. The corrected judgment was silent as to whether the sentences were to run concurrently or consecutively.

---

was disrespectful to the court by his tone of voice and manner when he replied, 'I'll certainly keep that in mind, your Honor' (T. E. 1355).

"*Contempt 4.* During cross-examination of Narvel Tinsley, by Mr. Schroering, Mr. Taylor interrupted and moved for a recess, was overruled by the court, and then became most disrespectful to the court and refused to take his seat at counsel's table as ordered.

"*Contempt 5.* Complete and utter disrespect by Mr. Taylor in the questioning of Mr. Irvin Foley, and (sic) attorney and Legal Advisor to the Louisville Police Department when he continually disobeyed the court's ruling regarding a press conference which the court had ruled on unadmissible (sic). Mr. Taylor accused the court of disallowing admittance of black persons in the courtroom during the examination of this witness and made a statement in the presence of the jury inferring that only white police officers could enter the courtroom. It has always been the rule of this court that there will be no interruption during the examination of a witness or during closing arguments by people coming and going into and from the courtroom, which rule was known to Mr. Taylor, (T. E. 1950–1955).

"*Contempt 6.* The witness Jesse Taylor, a Louisville Police Officer, read a statement by witness, David White. A Ruling was made by the court that the statement spoke for itself, had been introduced in evidence and could not be commented on by Officer Taylor, who merely took the statement. Mr. Taylor continued to disregard the court's order and ruling by continually reading parts of the statement out of context (T. E. 2008–2016).

"*Contempt 7.* Mr. Taylor in examining Mr. Norbert Brown, again referred to a press conference that the court had previously ordered him not to go into. He also waved his arms at the witness in a derogatory manner indicating the witness was not truthful and showing utter contempt of the court's ruling (T. E. 2030–2032).

"*Contempt 8.* The court directed Mr. Taylor to call his next witness. He called Lt. Garrett, Louisville Police Department. After the witness was sworn and took the stand, a deputy Sheriff advised the court that Mr. Taylor's aide was not searched, as everyone else

The Kentucky Court of Appeals affirmed, holding that petitioner was guilty of each and every contempt charged. In its view, petitioner's actions "were deliberate, delaying, or planned disruptive tactics which did in fact create such an atmosphere in the court that he, if permitted to continue, would have appeared to be the star performer in the center ring of a three-ring circus." 494 S. W. 2d, at 740. Petitioner had committed "innumerable acts . . . which clearly reflected his contempt for the court as well as the judicial system of this Commonwealth . . ." and had been "overbearing, contemptuous, and obnoxiously persistent in his questions and objections . . . ." *Id.,* at 741. The Court of Appeals also concluded that petitioner had not launched any "personal attack" on the trial judge and that the judge had neither conducted himself as an " 'activist seeking combat' " nor had become so personally embroiled that he was disqualified to sit in judgment on the charges of contempt, although his remarks prior to entering judgment of contempt at the conclusion of the trial were "inappropriate." *Id.,* at 744–745.

The Court of Appeals further ruled that because the amended judgment did not "direct that the sentences, as amended, be served consecutively . . . they must be served concurrently." *Id.,* at 746. Thus, "[t]he penalty actually imposed on Daniel Taylor [was] six months in jail," and his conviction and sentence without a jury trial

---

had been upon entering the courtroom. Mr. Taylor ordered the deputy to search his aide. The court ordered Mr. Taylor to begin his examination, which he refused to do until he was cited for contempt in the court's chamber (T. E. 2068–2069).

*"Contempt 9.* Mr. Taylor repeatedly asked the same question of witness Floyd Miller that the court had held improper. He was also disrespectful in his tone of voice when referring to a certain police officer as 'this nice police officer' (T. E. 2169–2172)." App. 24–26.

were deemed constitutionally permissible. *Id.,* at 747. The Kentucky Court of Appeals ruled, however, that it had exclusive authority to discipline or disbar attorneys and that, in any event, the rule in Kentucky since 1917 had been that suspension from practice was not a permissible punishment for criminal contempt. The order prohibiting petitioner from practicing in the Jefferson Circuit Court, Criminal Branch, Second Division, was therefore reversed. We granted certiorari limited to specified issues, 414 U. S. 1063 (1973).

## I

Petitioner contends that any charge of contempt of court, without exception, must be tried to a jury. Quite to the contrary, however, our cases hold that petty contempt like other petty criminal offenses may be tried without a jury and that contempt of court is a petty offense when the penalty actually imposed does not exceed six months or a longer penalty has not been expressly authorized by statute. *Cheff* v. *Schnackenberg,* 384 U. S. 373 (1966); *Bloom* v. *Illinois,* 391 U. S. 194 (1968); *Dyke* v. *Taylor Implement Mfg. Co., Inc.,* 391 U. S. 216 (1968); *Frank* v. *United States,* 395 U. S. 147 (1969); *Baldwin* v. *New York,* 399 U. S. 66 (1970). Hence, although petitioner was ultimately found guilty and sentenced separately on eight counts of contempt, the sentences were to run concurrently and were, as the Kentucky Court of Appeals held, equivalent to a single sentence of six months. Cf. *Codispoti* v. *Pennsylvania, post,* p. 506. The original sentences imposed on the separate counts were to run consecutively and totaled almost four and one-half years, with two individual counts each carrying a year's sentence. But the trial court itself entered an amended judgment which was understood by the Kentucky Court of Appeals to impose no more than a six-

month sentence. The eight contempts, whether considered singly or collectively, thus constituted petty offenses, and trial by jury was not required.

It is argued that a State should not be permitted, after conviction, to reduce the sentence to less than six months and thereby obviate a jury trial. The thrust of our decisions, however, is to the contrary: in the absence of legislative authorization of serious penalties for contempt, a State may choose to try any contempt without a jury if it determines not to impose a sentence longer than six months. We discern no material difference between this choice and permitting the State, after conviction, to reduce a sentence to six months or less rather than to retry the contempt with a jury. Cf. *Cheff* v. *Schnackenberg, supra,* at 380. In either case, the State itself has determined that the contempt is not so serious as to warrant more than a six-month sentence. We remain firmly committed to the proposition that "criminal contempt is not a crime of the sort that requires the right to jury trial regardless of the penalty involved." *Bloom* v. *Illinois, supra,* at 211; cf. *Argersinger* v. *Hamlin,* 407 U. S. 25, 30 (1972).

## II

We are more persuaded by petitioner's contention that he was entitled to more of a hearing and notice than he received prior to final conviction and sentence. In each instance during the trial when respondent considered petitioner to be in contempt, petitioner was informed of that fact and, in most instances, had opportunity to respond to the charge at that time. It is quite true, as the Kentucky Court of Appeals held, that "[t]he contempt citations and the sentences coming at the end of the trial were not and could not have been a surprise to Taylor, because upon each occasion and immediately following the charged act of contempt the court informed

Taylor that he was at that time in contempt of court."
494 S. W. 2d, at 741–742. But no sentence was imposed
during the trial, and it does not appear to us that any
final adjudication of contempt was entered until after
the verdict was returned. It was then that the court
proceeded to describe and characterize petitioner's various
acts during trial as contemptuous, to find him guilty of
nine acts of contempt, and to sentence him immediately
for each of those acts.

It is also plain from the record that when petitioner
sought to respond to what the Kentucky Court of Appeals
referred to as the trial court's "declaration of a charge
against Taylor based upon the judge's observations" dur-
ing trial,[4] respondent informed him that "[y]ou're not re-
sponding to me on anything" and even indicated that pe-
titioner might be gagged if he insisted on defending
himself.[5] The trial court then proceeded without further
formality to impose consecutive sentences totaling al-
most four and one-half years in the county jail and to bar
petitioner forever from practicing before the court in
which the case at issue had been tried.

This procedure does not square with the Due Process
Clause of the Fourteenth Amendment. We are not con-
cerned here with the trial judge's power, for the purpose
of maintaining order in the courtroom, to punish summar-
ily and without notice or hearing contemptuous conduct
committed in his presence and observed by him. *Ex parte
Terry*, 128 U. S. 289 (1888). The usual justification of
necessity, see *Offutt* v. *United States*, 348 U. S. 11, 14
(1954), is not nearly so cogent when final adjudication
and sentence are postponed until after trial.[6] Our de-

---

[4] 494 S. W. 2d 737, 744 (1973).

[5] App. 29.

[6] "Punishment without issue or trial [is] so contrary to the usual
and ordinarily indispensable hearing before judgment, constituting

cisions establish that summary punishment need not always be imposed during trial if it is to be permitted at all. In proper circumstances, particularly where the offender is a lawyer representing a client on trial, it may be postponed until the conclusion of the proceedings. *Sacher* v. *United States,* 343 U. S. 1 (1952); cf. *Mayberry* v. *Pennsylvania,* 400 U. S. 455, 463 (1971). But *Sacher* noted that "[s]ummary punishment always, and rightly, is regarded with disfavor . . . ." 343 U. S., at 8. "[W]e have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are 'basic in our system of jurisprudence.' " *Groppi* v. *Leslie,* 404 U. S. 496, 502 (1972), quoting *In re Oliver,* 333 U. S. 257, 273 (1948). Even where summary punishment for contempt is imposed during trial, "the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution." *Groppi* v. *Leslie, supra,* at 504 (and cases cited therein).[7]

On the other hand, where conviction and punishment are delayed, "it is much more difficult to argue that action without notice or hearing of any kind is necessary to preserve order and enable [the court] to proceed with its business." *Ibid.* As we noted in *Groppi,* the contemnors in the *Sacher* case were "given an opportunity to speak" and the "trial judge would, no doubt[,] have modified his action had their statements proved persuasive." *Id.,* at 506, and n. 11. *Groppi* counsels that before an attorney is finally adjudicated in contempt and sentenced

due process, that the assumption that the court saw everything that went on in open court [is] required to justify the exception; but the need for immediate penal vindication of the dignity of the court created it." *Cooke* v. *United States,* 267 U. S. 517, 536 (1925).

[7] *Groppi* dealt with contempt of a state legislative body, and the contempt action was not taken until several days later without notice or opportunity for Groppi to be heard.

after trial for conduct during trial, he should have reasonable notice of the specific charges and opportunity to be heard in his own behalf. This is not to say, however, that a full-scale trial is appropriate. Usually, the events have occurred before the judge's own eyes, and a reporter's transcript is available. But the contemnor might at least urge, for example, that the behavior at issue was not contempt but the acceptable conduct of an attorney representing his client; or, he might present matters in mitigation or otherwise attempt to make amends with the court. Cf. *Groppi* v. *Leslie, supra,* at 503, 506 n. 11.[8]

---

[8] The American Bar Association Advisory Committee on the Judge's Function has recommended, *inter alia:*

"Notice of charges and opportunity to be heard.

"Before imposing any punishment for criminal contempt, the judge should give the offender notice of the charges and at least a summary opportunity to adduce evidence or argument relevant to guilt or punishment.

*"Commentary*

"Although there is authority that in-court contempts can be punished without notice of charges or an opportunity to be heard, *Ex parte* Terry, 128 U. S. 289 (1888), such a procedure has little to commend it, is inconsistent with the basic notions of fairness, and is likely to bring disrespect upon the court. Accordingly, notice and at least a brief opportunity to be heard should be afforded as a matter of course. Nothing in this standard, however, implies that a plenary trial of contempt charges is required." American Bar Association Project on Standards for Criminal Justice, The Function of the Trial Judge § 7.4, p. 95 (Approved Draft 1972).

Cf. Fed. Rule Crim. Proc. 42 (b); *Harris* v. *United States,* 382 U. S. 162 (1965). State courts have reached a similar conclusion. See, *e. g.,* New York State Appellate Division, First and Second Departments, Special Rules Concerning Court Decorum § 609.2 (b) (1971) in N. Dorsen & L. Friedman, Disorder in the Court: Report of the Association of the Bar of the City of New York, Special Committee on Courtroom Conduct 352 (1973).

These procedures are essential in view of the heightened potential for abuse posed by the contempt power. *Bloom* v. *Illinois,* 391 U. S., at 202; *Sacher* v. *United States,* 343 U. S., at 12. The provision of fundamental due process protections for contemnors accords with our historic notions of elementary fairness. While we have no desire "to imprison the discretion of judges within rigid mechanical rules," *Offutt* v. *United States,* 348 U. S., at 15, we remain unpersuaded that "the additional time and expense possibly involved . . . will seriously handicap the effective functioning of the courts." *Bloom* v. *Illinois, supra,* at 208–209. Due process cannot be measured in minutes and hours or dollars and cents. For the accused contemnor facing a jail sentence, his "liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." *Morrissey* v. *Brewer,* 408 U. S. 471, 482 (1972).

Because these minimum requirements of due process of law were not extended to petitioner in this case, the contempt judgment must be set aside.[9]

---

[9] My Brother REHNQUIST's dissent insists that the Court has rejected the teaching of *Sacher* v. *United States,* 343 U. S. 1 (1952), that in a posttrial contempt proceeding, the court need not afford the contemnor the full panoply of procedures such as "the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with *a conventional court trial." Id.,* at 9 (emphasis added). But all we have decided today is that a contemnor is entitled to the elementary due process protections of "reasonable notice of the specific charges and opportunity to be heard in his own behalf," *supra,* at 499, neither of which petitioner received. Nowhere do we intimate that "a full-scale trial is appropriate." *Ibid.;* see also n. 8, *supra.* Moreover, whatever justifications may sometimes necessitate immediate imposition of summary punishment during trial "to maintain order in the courtroom and the integrity of the trial process in the face of an 'actual obstruction of justice,' " *Codispoti* v. *Pennsylvania, post,* at 513, "[r]easons for permitting straightway

## III

We are also convinced that if petitioner is to be tried again, he should not be tried by respondent. We agree with the Kentucky Court of Appeals that petitioner's conduct did not constitute the kind of personal attack on respondent that, regardless of his reaction or lack of it, he would be "[un]likely to maintain that calm detachment necessary for fair adjudication." *Mayberry* v. *Pennsylvania,* 400 U. S., at 465.

But contemptuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot "hold the balance nice, clear and true between the State and the accused . . . ." *Tumey* v. *Ohio,* 273 U. S. 510, 532 (1927). In making this ultimate judgment, the inquiry must be not only whether there was actual bias on respondent's part, but also whether there was "such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar* v. *Sarafite,* 376 U. S. 575, 588 (1964). "Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties," but due process of law requires no less. *In re Murchison,* 349 U. S. 133, 136 (1955).

With these considerations in mind, we have examined the record in this case, and it appears to us that respondent did become embroiled in a running controversy with petitioner. Moreover, as the trial progressed, there was a mounting display of an unfavorable personal attitude toward petitioner, his ability, and his motives, sufficiently

---

exercise of summary power are not reasons for compelling or encouraging its immediate exercise." *Sacher* v. *United States, supra,* at 9–10.

so that the contempt issue should have been finally adjudicated by another judge.

Early in the trial respondent cautioned petitioner against "putting on a show" and added that "if you give him an inch, he'll take a mile. I might as well sit on him now." App. 31, 40. On another occasion when petitioner asserted that his purpose was to defend his case, respondent replied, "I'm not sure." *Id.*, at 61. When petitioner remarked that he had five months wrapped up in the case, respondent retorted that "[b]efore it's over, you might have a lot more than that." *Id.*, at 98. On the other hand, petitioner complained of respondent's "overbearing contentiousness in regard to me, both by phrase and by its utterances," and asserted that the court was prejudicing the trial of his case. *Id.*, at 60. Respondent was likewise said to be "using [the] brute power of your office" in saying that petitioner was damaging his client. *Id.*, at 61. On another occasion, respondent understood petitioner to be asserting that he, respondent, had rigged the jury. *Id.*, at 85–86.

That respondent had reacted strongly to petitioner's conduct throughout the 10-day trial clearly emerged in the statement which he made prior to sentencing petitioner and which the Court of Appeals characterized as "inappropriate." There he said petitioner had put on "the worst display" he had seen in many years at the bar—"[a]s far as a lawyer is concerned, you're not." *Id.*, at 28. Furthermore, respondent denied petitioner the opportunity to make any statement at that time, threatened to gag him and forthwith sentenced him to almost four and one-half years in jail, not to mention later disbarring him from further practice in his court. He also refused to grant him bail pending appeal. We assume for the purposes of this case that each of the charged acts was contemptuous; nevertheless, a sentence of this magnitude reflects the extent to which the respondent became per-

sonally involved.   Cf. *Offutt* v. *United States,* 348 U. S., at 17.

From our own reading of the record, we have concluded that "marked personal feelings were present on both sides" and that the marks of "unseemly conduct [had] left personal stings," *Mayberry* v. *Pennsylvania,* 400 U. S., at 464.   A fellow judge should have been substituted for the purpose of finally disposing of the charges of contempt made by respondent against petitioner.   Respondent relies on *Ungar* v. *Sarafite, supra,* but we were impressed there with the fact that the judge "did not purport to proceed summarily during or at the conclusion of the trial, but gave notice and afforded an opportunity for a hearing which was conducted dispassionately and with a decorum befitting a judicial proceeding."   376 U. S., at 588.[10]

Nothing we have said here should be construed to condone the type of conduct described in the opinion of the Kentucky Court of Appeals and found by that court to have been engaged in by petitioner.   Behavior of this nature has no place in the courtroom which, in a free society, is a forum for the courteous and reasoned pursuit of truth and justice.

---

[10] MR. JUSTICE REHNQUIST's dissent also asserts that our decision provides the means whereby "a judge *can* be driven out of a case by any counsel sufficiently astute to read the new-found constitutional principles enunciated [here and in *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971)]." *Post,* at 530.  But this statement—perhaps dissenter's license—misconceives our holding and undervalues the import of the Due Process Clause.  As expressly noted in the text, we by no means equate this case with *Mayberry* v. *Pennsylvania.* It is not petitioner's conduct, considered alone, that requires recusal in this case; rather, the critical factor, as revealed by the record before us, is the character of respondent's response to misbehavior during the course of the trial.  The dissent, of course, may view the record differently, but on that issue we are in unavoidable disagreement.

The judgment of the Kentucky Court of Appeals is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE DOUGLAS joins Parts II and III of the Court's opinion.

[For dissenting opinion of MR. JUSTICE REHNQUIST, see *post*, p. 523.]

MR. JUSTICE MARSHALL, dissenting in part.

I join Parts II and III of the opinion of the Court, but I cannot join the holding in Part I that petitioner was not entitled to a jury trial. Petitioner was summarily convicted of contempt and sentenced to almost four and one-half years in prison. In my view, this sentence marked the contempt charges against petitioner as "serious" rather than "petty" and called into play petitioner's Sixth Amendment right to a jury trial.

The Court, however, relies on the fact that the trial judge subsequently realized his error and reduced the sentence to six months. The Court characterizes this as a determination by the State that "the contempt is not so serious as to warrant more than a six-month sentence." *Ante,* at 496. In my view, the trial judge's reduction of petitioner's sentence was a transparent effort to circumvent this Court's Sixth Amendment decisions and to save his summary conviction of petitioner without the necessity of airing the charges before an impartial jury. It is hardly coincidence that petitioner's sentence was reduced to the maximum that our decisions would permit.

Today's decision represents an extraordinarily rigid and wooden application of the six-month rule that the Court has fashioned to determine when the Sixth Amend-

ment right is applicable. In permitting this obvious device to succeed, I think that the Court changes the nature of the six-month rule from a reasonable effort to distinguish between "serious" and "petty" contempts into an arbitrary barrier behind which judges who wish to protect their summary contempt convictions without exposing their charges to the harsh light of a jury may safely hide. The very fact that such a substantial contempt sentence was imposed, and then reduced to the six-month maximum, should be a warning to us that the fairness of the process which petitioner has received is suspect, and that the contempt charges involved here especially require the scrutiny of a jury trial. Statements in the plurality opinion in *Cheff* v. *Schnackenberg*, 384 U. S. 373, 380 (1966), to the contrary notwithstanding, I do not believe that petitioner could be deprived of his Sixth Amendment right to jury trial, once it attached through the imposition of a substantial sentence, by the subsequent action of the trial court or an appellate court in reducing the sentence.