160 N.J. Super. 322 (1978)
389 A.2d 995
IN THE MATTER OF CONTEMPT OF JACK H. UNGAR, AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued January 3, 1978.
Decided July 3, 1978.
*324 Before Judges FRITZ, BOTTER and ARD.
Mr. Alexander D. Lehrer argued the cause of appellant Jack H. Ungar (Messrs. Anschelewitz, Barr, Ansell & Bonello, attorneys).
Mr. Philip B. Whitcomb, Deputy Attorney General, argued the cause for respondent State of New Jersey (Mr. William F. Hyland, Attorney General, attorney).
*325 The opinion of the court was delivered by BOTTER, J.A.D.
Appellant Jack Ungar was held in contempt for asking a prosecution witness, Linda Banks, an improper question on cross-examination. The form of the question suggested that the prosecutor had assured Miss Banks immunity from prosecution in exchange for her testimony. When appellant conceded that he was mistaken in his belief that such a promise had been made, his conduct was deemed to offend DR 7-106(C). Section 1 of this disciplinary rule forbids an attorney from stating or alluding to:
* * * any matter that he has no basis to believe is relevant to the case or that will not be supported by admissible evidence.
On this appeal Ungar contends that he had a reasonable basis for putting the question to the witness and that his conviction for contempt was not warranted.
The incident occurred during a jury trial in which Ungar was defending Norman Seruby on a manslaughter charge. The charge emanated from Seruby's sale of heroin to a friend who died after using the drug. The State sought to prove that the sale, use and death took place on May 16, 1975 in an apartment which Miss Banks shared with Seruby.
Miss Banks gave the police a statement on May 17 which exculpated Seruby. However, Seruby's relationship with Miss Banks began to disintegrate not long thereafter. Miss Banks testified that Seruby moved out of the apartment around August of that year, although he left his clothes there and "he still had a key to come back and forth as he pleased."
On September 22, 1975 the police raided Miss Banks' apartment pursuant to a search warrant and seized narcotics paraphernalia located on a night-table beside the bed. Both Seruby and Miss Banks were charged with unlawful possession. Several days thereafter, on September 26, Miss Banks gave the police a statement which implicated Seruby in the death of his friend and contradicted her statement of May 17. Thereafter, Seruby was tried in the Ocean Township *326 Municipal Court for possession of narcotics paraphernalia. Miss Banks testified against him and he was convicted. On October 10, 1975 Miss Banks gave the police an additional statement implicating Seruby in his friend's death.
This set the stage for the incident at the manslaughter trial which led to Ungar's difficulties. Banks was the State's principal witness. Ungar confronted her on cross-examination with inconsistencies in her three statements, focusing on the May 17 statement which she later repudiated. Ungar sought to show that her testimony and the September statement, given shortly after the raid on her apartment, were inspired by a motive to cooperate with the police in exchange for immunity. Ungar's cross-examination concluded with the question that precipitated the contempt charge. The transcript reads as follows:
Q About that `phone call, isn't it true that just prior to your changing your story in statement number two which you implicate Norman Seruby, the September 26th statement, that just prior to that the Ocean Township Police Department raided your apartment and seized therein a quantity of narcotics paraphernalia and charged you with possession of that naroctics paraphernalia and then made a deal with you that you would not be punished, you would not have to go to trial for it if you would give a statement implicating Norman Seruby, is that not true?
A It's not true.
Q Absolutely not true?
Prosecuting Attorney: I object, I hope he's going to establish evidence to predicate the question he put to the Witness.
THE COURT: I hope so, too.
MR. UNGAR: Yes, Your Honor. I have no further questions.
THE COURT: Anything else, Mr. Mullaney?
Prosecuting Attorney: Nothing further of this Witness, Judge.
THE COURT: Okay, you may step down.
(Witness excused.)
That night Ungar spoke to an investigating officer, Detective Miller, who told him that he recalled that no deal had been made with the Ocean Township Police *327 Department "and, in fact, that she [Miss Banks] was on trial as well as Mr. Seruby * * *." On that basis, before the manslaughter trial resumed the next day, Ungar reported this new information to the trial judge and asked him to instruct the jury to disregard his last question and Miss Banks' answer.
The trial judge asked Ungar to state the basis of his question. Ungar replied that Seruby had told him that only he and not Miss Banks had been tried in the Ocean Township Municipal Court regarding the narcotics paraphernalia seized at Miss Banks' apartment. Ungar stated further that he called the municipal court clerk who confirmed that the charges against Miss Banks "had been dropped."
After further discussion the trial judge read the provisions of DR 7-106(C) into the record and called upon Ungar then and there to show cause why he should not be held in contempt since he "had no basis in fact" for the assertion contained in the question put to Miss Banks. Expressing surprise, Ungar mentioned a third source for his belief. Another person who was present in the municipal court when the charges against Seruby and Miss Banks were to be heard confirmed that the charges against Miss Banks had been dropped. Ungar asserted that he had acted in good faith and felt "there was sufficient basis for believing a deal had been made." He offered to state to the jury that he was in error and urged that a curative charge be given or a mistrial declared. He also apologized to the court.
The prosecuting attorney stated that it was his understanding that both Seruby and Banks had been tried on charges related to the narcotics paraphernalia seized on September 22, and "that Linda Banks took the stand, testified on her own behalf and * * * was acquitted by the Magistrate * * *." He represented that no deal had been made. The trial judge then found that there was no basis for Ungar's "statement" contained in his question. He termed Ungar's conduct "a flagrant disregard of the authority and dignity of the Court and so prejudicial to the *328 parties and the administration of justice as to justify the exercise of the power of contempt * * *." He imposed a fine of $100, payable to the Monmouth County Court. All of this took place on March 30, 1976, during a recess in the manslaughter trial of Norman Seruby. The fine was paid immediately and the trial against Seruby continued.
On April 2, 1976 a written order of contempt was entered memorializing the summary adjudication of appellant for his contempt of court based upon the question which he had put to Linda Banks The order recited that "appellant had no reason to believe that the said charges [alluded to in his question] were true * * *." By asking the question it was found that appellant violated DR 7-106 (C) (1), (2) and (7) and N.J.S.A. 2A:10-1.[1]
On May 13, 1976[2] appellant moved to vacate the contempt order. His supporting affidavit recited that the records of the Ocean Township Municipal Court showed that the case *329 against Miss Banks was dismissed on motion of the prosecutor for lack of evidence. (The prosecutor stated that heroin paraphernalia was found on the night-table on Seruby's side of the bed and the night-table on Miss Bank's side "had her credentials but not heroin.") Further investigation satisfied appellant that there was "no formal deal" for the dismissal of the charges but that there was a "tacit understanding" that cooperation of Miss Banks would be rewarded by favorable treatment. This inference was fortified by his conversation with the attorney who represented Miss Banks on the charge in the Municipal Court. He told appellant that Miss Banks had been asked in late September or early October to give the county prosecutor a statement regarding the death of Seruby's friend. Miss Banks' attorney was assured by county detectives that they had no intention of bringing charges against Miss Banks. On that "understanding" the attorney agreed to let his client give the October 10 statement. There was no "formal deal" regarding the municipal court charges. However, at the municipal court hearing Miss Banks' attorney told the detective in charge of the case that Miss Banks was innocent of the charge and he would not let her testify if the charges against her were pursued. Thereafter the prosecutor moved to dismiss the charges and only the case against Seruby was heard.
Relying on R. 3:18-2, although expressing doubt as to which rule governed, the trial judge dismissed Ungar's motion as out of time. R. 3:18-2 establishes a ten-day time limit for a motion for acquittal notwithstanding a guilty verdict returned by a jury and in cases where a jury is discharged without reaching a verdict. This rule does not apply to the case at hand. R. 3:20-1, which governs motions for a new trial and motions to vacate a judgment in nonjury cases, is pertinent. R. 3:20-2 provides no time limit when the motion is based on newly discovered evidence, but a motion for a new trial on other grounds must be made within ten days "or within such further time as the court fixes during the 10-day period." These time limitations may not be enlarged. R. 1:3-4(c).
*330 Ungar's motion was based on evidence that might be deemed "newly discovered" since the summary contempt proceeding afforded Ungar no opportunity to fully discover all the evidence bearing on his guilt. But we need not consider whether the motion was timely. Without the additional information presented on that motion we have concluded that there was insufficient basis for holding him in contempt in the first place.
A contempt committed in the presence of a judge "may be adjudged summarily by the judge without notice or order to show cause" R. 1:10-1. Summary contempt convictions are reviewable on the facts as well as the law on appeal. R. 2:10-4; N.J.S.A. 2A:10-3; In re Clawans, 69 N.J. Super. 373, 378 (App. Div. 1961), certif. den. 36 N.J. 296, cert. den. 370 U.S. 905, 82 S.Ct. 1250, 8 L.Ed.2d 401 (1962). The power to punish summarily for contempts committed in the face of the court, although "liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions." Ex Parte Terry, 128 U.S. 289, 313, 9 S.Ct. 77, 83, 32 L.Ed. 405, 412 (1888). See Weehawken Tp. Bd. of Health v. New York Central R. Co., 10 N.J. 284, 290 (1952).
Not only disobedience to orders of the court, but any misbehavior which tends to impede the administration of justice may constitute a contempt. See N.J.S.A. 2A:10-1; In re Clawans, supra, 69 N.J. Super. at 381; 17 Am. Jur.2d, Contempt, § 33 at 6 (1964). This includes conduct of an attorney which tends to obstruct justice. In re Logan, 52 N.J. 475 (1968); In re Kozlov, 156 N.J. Super. 316, 325-326 (App. Div. 1978); In re Clawans, supra; see In re Carton, 48 N.J. 9, 21 (1966). We have no doubt that an attorney may be held in contempt for asking a question when ordered not to do so,[3] or when the question *331 is designed to mislead the jury and to unfairly prejudice an adverse party and, thus, is calculated to impede, obstruct or distort the administration of justice. Offutt v. United States, 93 U.S. App. D.C. 148, 149, 208 F.2d 842, 843 (D.C. Cir.1953), rev'd on other grounds, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954) (misconduct included asking questions which were highly prejudicial to the witness and for which there was no foundation); Hallinan v. United States, 182 F.2d 880, 886 (9 Cir.1950), cert. den. 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375 (1951) (persistent improper cross-examination despite rulings of the court); Hawk v. Superior Court, 42 Cal. App.3d 108, 128, 116 Cal. Rptr. 713, 726 (D. Ct. App. 1974), cert. den. 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (1975) (improper impeachment of witness by attempting to show he was in jail); see People v. Fusaro, 18 Cal. App.3d 877, 886-887, 96 Cal. Rptr. 368, 373 (D. Ct. App. 1971), cert. den. 407 U.S. 912, 92 S.Ct. 2445, 32 L.Ed.2d 686 (1972) (deliberately asking questions calling for inadmissible and prejudicial answers).
As noted above, in putting questions to witnesses it is improper and unprofessional for an attorney to allude to prejudicial irrelevancies and matters which he has no reason to believe will be supported by admissible evidence. DR 7-106(C) (1); 6 Wigmore, Evidence (Chadbourn rev. ed. 1976), § 1803 (2) at 371; A.B.A. Standards, the Prosecution Function, § 5.7(d) and The Defense Function, § 7.6(d). On the facts of this case, however, we find no basis for holding Ungar in contempt.
It is proper to probe a witness' bias or motive in testifying as it may affect credibility. Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974); State v. Vaccaro, 142 N.J. Super. 167, 176 (App. Div.), certif. den. 71 N.J. 518 (1976). This includes the right to prove that there was an arrangement made by the State for favorable treatment of the witness or merely the hope for favorable treatment. Id. Although here the *332 question referred to a specific "deal" for immunity, Ungar had enough information to suspect such an arrangement and he was justified in pursuing it on cross-examination. An attorney should be afforded reasonable latitude in cross-examining a key witness as long as the general area of inquiry is appropriate. See Sprinkle v. Davis, 111 F.2d 925, 930 (4 Cir.1940), cert. den. 314 U.S. 647, 62 S.Ct. 90, 86 L.Ed. 519 (1941).
Ungar relied on information received from three sources, his client, his client's friend  both of whom were present in the Municipal Court  and the clerk of that court. Opposed to this was the absence of any memorandum in the prosecutor's file stating promises were made to Miss Banks. In addition, the prosecuting attorney made representations to the court that were apparently based upon information received from Detective Miller who was present during the contempt proceedings.
Not having Miller's version when he asked the question, it is evident that Ungar asked the question in good faith. Moreover, in view of the conflicting reports as to what transpired, it cannot be said that Ungar's misbehavior was established beyond a reasonable doubt. We are concerned here with a criminal contempt whose purpose is "to punish an offender for his affront to government." In re Carton, supra, 48 N.J. at 20-22. As such, the contemnor is entitled to the presumption of innocence, and his guilt must be established beyond a reasonable doubt. In re Buehrer, 50 N.J. 501, 515-516 (1967).
It is essential that a judge have the power to punish offensive behavior and obstructions to justice committed in the presence of the court. In re Carton, supra, 48 N.J. at 21. The need to control the proceedings may impel swift action. Id. The judge may act upon his own knowledge of the facts, but the contemnor's right to be heard includes the right to present "proof of material facts, if any, of which the court may be unaware." Id. Indeed, the right to be heard is a due process right of constitutional dimension. *333 Taylor v. Hayes, 418 U.S. 488, 496-500, 94 S.Ct. 2697, 2702-2704, 41 L.Ed.2d. 897, 906-908 (1974).
It is often useful to postpone disposition of a contempt charge against an attorney arising during trial until the primary trial itself has ended. Sacher v. United States, 343 U.S. 1, 8-10, 72 S.Ct. 451, 454-456, 96 L.Ed. 717, 723-724 (1952); see Taylor v. Hayes, 418 U.S. 488, 498-500, 94 S.Ct. 2697, 2703-2704, 41 L.Ed.2d 897, 907-908 (1974); cf. State v. Zoppi, 72 N.J. Super. 432, 436-437 (App. Div. 1962). When, as here, the misconduct is not likely to repeat itself, withholding immediate action has much in its favor. Sacher v. United States, supra. A deliberate course encourages a more dispassionate evaluation of the incident. State v. Zoppi, supra. Also, it is less likely to interfere with the attorney's first obligation, the assiduous representation of his client.
We do not condemn the trial judge for proceeding summarily in this case since Ungar was willing to concede the accuracy of Miller's report despite the contradictory information Ungar had received. However, a factual issue was raised by the contradictions. Even without resolving it by reference to the actual records of the Municipal Court, enough had been shown to dispel any hint of bad faith on Ungar's part.
Reversed and remanded solely for the purpose of entering an order vacating the April 2, 1976 order of contempt and imposition of a fine.
NOTES
[1] The pertinent portions of DR 7-106(C) are:

(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:
(1) State or allude to any matter that he has no basis to believe is relevant to the case or that will not be supported by admissible evidence.
(2) Ask any question that he has no basis to believe is relevant to the case and that is intended to degrade a witness or other person.
* * * * * * * *
(7) Intentionally violate any established rule of procedure or of evidence.
N.J.S.A. 2A:10-1 provides:
The power of any court of this state to punish for contempt shall not be construed to extend to any case except the:
a. Misbehavior of any person in the actual presence of the court;
b. Misbehavior of any officer of the court in his official transactions; and
c. Disobedience or resistance by any court officer, or by any party, juror, witness or any person whatsoever to any lawful writ, process, judgment, order, or command of the court.
Nothing contained in this section shall be deemed to affect the inherent jurisdiction of the superior court to punish for contempt.
[2] The manslaughter trial ended on March 30, 1976.
[3] See Pennsylavina v. Local Union 542, Int'l Union of Operating Engineers, 552 F.2d 498, 506, 511-512 (3 Cir.1977), cert. den. 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (197).