MARY PAYNE *et al.*, Plaintiffs-Appellees, *v.* COATES-MILLER, INC., Defendant.—(WILLIAM HENNING RUBIN, Respondent-Appellant.)

First District (4th Division)    No. 77-707

Opinion filed January 18, 1979.

William Henning Rubin, of Chicago, for appellant, *pro se.*

William P. Wilen and Nancy Boyland Collins, both of Chicago, for appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

Following a hearing in the circuit court of Cook County, William Henning Rubin, attorney for defendant, Coates-Miller, was held in criminal contempt of court and fined $1,000 for willfully impeding the progress of pretrial discovery. Rubin appeals, contending: (1) the trial court lacked jurisdiction to entertain the rule to show cause petition; (2) the trial judge should have recused himself from the contempt proceedings; and (3) the evidence demonstrates that his conduct was not contemptuous.

We affirm the judgment of the trial court.

On October 31, 1975, a class action complaint was filed against defendant, Coates-Miller, on behalf of plaintiff, Mary Payne, both individually and as a representative of all other tenants residing in buildings managed and operated by defendant. The complaint challenged Coates-Miller's practice of assessing costs and attorney fees against a tenant for late rental payments, *before* Coates-Miller had successfully litigated a forcible entry and detainer action against the tenant.

On June 17, 1976, plaintiffs mailed a notice of deposition to William Henning Rubin, Coates-Miller's attorney of record.[1] The notice informed Rubin that the deposition of Harrison Daniels, an employee of Coates-Miller, would be taken on June 29. The notice also requested that Daniels produce certain specified documents at his deposition.

On June 24, Rubin informed Nancy Collins, one of plaintiffs' attorneys, that the June 29 date for Daniels' deposition was out of the question. When asked for an alternative date, Rubin simply told Ms. Collins that she "would be lucky to get discovery within a year or a year and a half."

On July 7, plaintiffs filed a motion to compel discovery. Following a hearing, the trial judge ordered Daniels to appear in court on July 13 for the taking of his deposition. Daniels, however, left the City of Chicago July 11 on a trip to Mexico and did not appear for his July 13 deposition as ordered. Plaintiffs were given no advance notice that Daniels would not appear.

On July 14, plaintiffs filed a second motion to compel discovery. Following a hearing, the trial court ordered Daniels to produce by July 28 the documents plaintiffs had previously requested and to appear in court for the taking of his deposition on August 4.

Plaintiffs also filed on July 14 a motion for preliminary injunction. The injunction sought to enjoin Coates-Miller's practice of assessing

---

[1] Supreme Court Rule 11 (Ill. Rev. Stat. 1975, ch. 110A, par. 11(a)) provides that "[i]f a party is represented by an attorney of record" service of all court papers, aside from the initial process and complaint, "shall be made upon the attorney."

expenses and attorney fees against tenants for late rental payments, before Coates-Miller had successfully litigated a forcible entry and detainer action against them. The preliminary injunction was granted.

On July 21, Coates-Miller filed a notice of appeal from the interlocutory order granting plaintiffs the preliminary injunction. (See Ill. Rev. Stat. 1975, ch. 110A, par. 307(a)(1).)[2] During the pendency of that appeal, the discovery procedures with regard to the merits of this case continued at the trial level.

Daniels returned from his vacation to Mexico on July 26. Nevertheless, he did not produce by July 28 the documents plaintiffs had requested, and he did not appear for his court-ordered deposition on August 4.

The trial court issued a rule to show cause why Daniels should not be held in contempt of court for his alleged willful failure to comply with both the July 7 and July 14 discovery orders. At his rule-to-show-cause hearing, Daniels testified that Rubin had never informed him of any scheduled depositions or of any order to produce documents:

"Q. Have you ever discussed *with your attorney Mr. Rubin or with anybody else* the fact that you had been asked to appear in a deposition in this case?
A. No.

* * *

Mr. Mazur: * * * [D]id Mr. Rubin ever make you aware of an Order of this Court on July 7th that you were to appear at a deposition on July 13th in this courtroom?
A. No.
Q. Did Mr. Rubin ever make you aware of an Order of this Court issued on July 14th, 1976 that you were to give to plaintiffs' attorneys by July 28th documents listed in plaintiffs' Exhibit 1?

* * *

The Witness: No."

In light of this testimony, the rule to show cause which was issued against Daniels was dismissed.

On August 20, plaintiffs petitioned the trial court to issue a rule to show cause why Rubin, as Coates-Miller's attorney, should not be held in contempt of court for willfully impeding the progress of pretrial discovery by violating the court's discovery orders of July 7 and July 14. Following a hearing on plaintiffs' petition, the trial court issued the rule to show cause against Rubin. The rule-to-show-cause hearings were held on December 30, 1976, and on February 2 and 3, 1977. Rubin was represented by counsel at these hearings.

---

[2] For the disposition of that appeal see *Payne v. Coates-Miller, Inc.* (1977), 52 Ill. App. 3d 288, 367 N.E.2d 406.

The first witness called by plaintiffs at the hearings was attorney Nancy Collins. Ms. Collins testified that on June 24, 1976, she talked with Rubin about Daniels' June 29 deposition. Rubin informed her that the deposition could not go ahead as it was incompatible with his (Rubin's) schedule. Ms. Collins testified further:

> "I asked Mr. Rubin about alternative dates within the relative period around the middle to the end of June or the beginning of July and Mr. Rubin said that none of those dates were possible.
>
> I then pressed him for a date saying that we didn't want to come to Judge Cohen on a motion to compel discovery. Mr. Rubin told me at that time that I didn't understand the case and that we would be lucky to get discovery within a year or a year and a half."

Ms. Collins also stated that when Daniels failed to produce certain documents on July 28 as ordered by the trial court, she called Rubin and asked when the documents would be produced. Rubin told her that "he was * * * very busy and * * * had not had time to decide whether or not he was going to produce the documents."

The plaintiffs called Harrison Daniels as their next witness. Daniels is an employee of Coates-Miller and is the manager of the only office Coates-Miller maintains in the Chicago area. Essentially repeating the testimony he gave at *his own* rule-to-show-cause hearing, Daniels stated that prior to August 16, 1976, he had never been informed by Rubin of any court-ordered depositions or of any order to produce documents. Daniels was questioned further on this point:

> "Q. Mr. Daniels, did you at any time during the pendency of this lawsuit receive a request from either Brian Flisk, Barry Flisk, Howard Weitzman or anyone else in the [Coates-Miller] organization to assemble records in connection with [the] Payne versus Coates-Miller case?
>
> A. Yes.
>
> Q. Do you recall when that took place?
>
> A. No, truthfully I can't pin down the exact time * * *."

Brian Flisk testified next. Flisk is chairman of the board of B. Coleman, Inc., the parent corporation of Coates-Miller. Flisk was asked if Rubin had ever informed him of the trial court's discovery orders of July 7 and 14 which directed that Daniels appear for his deposition on July 13 and August 4 respectively. Flisk could only recall Rubin mentioning one time that "a deposition was scheduled." Flisk could not remember when Rubin made the statement or whose deposition Rubin was talking about.

Flisk was also asked if Rubin had informed him of the trial court's discovery order directing Daniels to produce specified documents by July 28. Flisk responded:

> "I know he [Rubin] told us that we had to produce documents. The specific date I don't remember.

\* \* \*

Q. When did he tell you this?

A. The date I don't remember.

Q. Was it in August, August 16th after Mr. Daniels was here [for his rule-to-show-cause hearing]?

A. I don't remember."

Rubin took the stand and testified in his own behalf. The vast majority of Rubin's testimony is completely irrelevant with regard to the basis of the rule-to-show-cause proceeding. Rubin made only one statement with regard to his efforts to ensure compliance with the trial court's July 7 and 14 discovery orders:

"Q. When you discussed the Orders entered by this Court with your clients, did you inform them that there was—there were discovery matters outstanding?

A. Yes.

Q. And what did you tell them?

A. I told them that Mr. Daniels—that the presence of Mr. Daniels was required to be deposed and *that they should ascertain a date when he would be available, and I said see if it fitted into my schedule* and I would advise Counsel as to what date we could proceed." (Emphasis added.)

Rubin also called Howard Weitzman, president of Coates-Miller, as a witness. Weitzman testified that he and Rubin had about three or four conversations in June and July of 1976. However, Weitzman could only recall Rubin telling him during these two months to get certain records together "because we're going to need them."

Following the close of all the evidence and after considering the arguments and memoranda of counsel, the trial court found Rubin guilty of indirect criminal contempt and fined him $1,000. In rendering its judgment, the trial court made the following express findings:

"12. The testimony of Brian Flisk and Howard Weitzman, witnesses proferred [sic] by respondent for the purpose of demonstrating that Mr. Rubin did seek to ensure compliance with the Court orders of July 7, 1976 and July 14, 1976, is not credible. Given the inability or unwillingness of said witnesses to specify when Mr. Rubin spoke with them about the discovery proceedings which were the subject of the above orders, the testimony of Messrs. Flisk and Weitzman merely substantiates the fact that Mr. Rubin did not in fact seek to ensure compliance with the orders.

13. No other credible evidence was proferred [sic] by Mr. Rubin which establishes any cause why he could not or did not seek to ensure compliance with the aforesaid orders.

14. Mr. Rubin's conduct demonstrates that he willfully failed and refused to obey the aforesaid orders, although able to do

otherwise. He has thereby expressed and shown his defiance and contempt for this Court."

Rubin appeals.

OPINION

Considering the nature of this appeal, we believe a few preliminary comments are appropriate. In a very real sense, modern American litigation *is* pretrial discovery. Lawyers spend an enormous amount of time taking depositions, asking, answering and arguing over labyrinthine sets of interrogatories and chasing down and examining documents. (See Liman, *The Quantum of Discovery vs. the Quality of Justice: More is Less*, 4 Litigation 8 (1978)). The reward for effective pretrial discovery— to both the courts and the litigants—is often a settlement, albeit often on the courthouse steps.

The underlying philosophy which gave impetus to the expansion and liberalization of our discovery rules was the desire of the courts to replace the traditional "combat" theory of litigation with the more equitable principle that litigation should be a joint search for the truth.[3] Accordingly, pretrial discovery is designed to permit exploration and to avoid surprise. It is directed toward making the judicial process one of disseminating facts relevant to the issues and to the rendering of a just decision, rather than promoting a battle of wits between counsel, where shock and surprise rule the result. (See *Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 361, 221 N.E.2d 410, 417; *Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 132 N.E.2d 532.) As Justice Douglas stated:

"Modern instruments of discovery * * * make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co.* (1958), 356 U.S. 677, 682, 2 L. Ed. 2d 1077, 1082, 78 S. Ct. 983, 986.

The principle method by which unreasonable impediments to and abuses of discovery are curtailed is *not* judicial intervention. It is "the control exercised *by attorneys themselves*, animated by a spirit of cooperation, a fear of reprisals, an appreciation of the judicial sanctions available if recalcitrance persists and above all, by their knowledge that they are officers of the court * * *." (Emphasis added.) (Judge I. R. Kaufman, *Judicial Control Over Discovery* 28 F.R.D. 111, 116.) Most attorneys are reasonable in their demands for discovery and in their recognition of the other party's need for discovery. They are aware of the advantages to be drawn from having all the facts disclosed before trial and will cooperate with each other in achieving that result.

■■ When a conflict does arise and an attorney feels his adversary's

---

[3] "[T]ruth is the heart of all discovery." *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67, 374 N.E.2d 460, 467.

discovery request is unreasonable or oppressive, he should not dig his heels in and become recalcitrant. He should seek the protection of the trial court. (See, *e.g.*, Ill. Rev. Stat. 1977, ch. 110A, par. 201(c).)

> "[T]hrowing up hands in horror and declaring that the courts give no protection is not a satisfactory approach; as in any other legal endeavor a fair appraisal of the \* \* \* [discovery] rules followed by careful preparation and advocacy will result in safeguards. The courts will give as much protection as is authorized by statute, applied for with intelligence, and warranted by the facts." Judge I. R. Kaufman, *Judicial Control Over Discovery* 28 F.R.D. 111, 123.

Conversely, if an attorney feels an adversary is unreasonably impeding the progress of pretrial discovery, his proper recourse is to enlist the aid of the trial judge. Generally, if the attorney's discovery request is legitimate, the trial judge will order the other party's compliance. A refusal to obey such a discovery order strikes at the very life-line of the court. As Justice Burman stated in *In re Estate of Atwood v. De Bella* (1968), 97 Ill. App. 2d 311, 324, 240 N.E.2d 451, 457:

> "Judicial orders are the most solemn acts of the court, and if they are not obeyed they cease to be judicial \* \* \*."

To enforce compliance with discovery orders and procedures and to punish noncompliance, the trial court has a variety of weapons at its disposal, including the statutory power to impose sanctions (Ill. Rev. Stat. 1977, ch. 110A, par. 219) and its own inherent contempt power (47th & State Currency Exchange, Inc. v. B. Coleman Corp. (1977), 56 Ill. App. 3d 229, 371 N.E.2d 294). (See generally *Sanctions Imposed by Courts on Attorneys Who Abuse The Judicial Process*, 44 U. Chi. L. Rev. 619 (1977).) The late Justice Dooley stressed the importance of trial courts dealing swiftly and surely with violations of discovery orders and procedures:

> "Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances." (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67, 374 N.E.2d 460, 467.)

With these preliminary comments as a background, we now reach the contentions raised by Rubin.

## I

Rubin asserts initially that the trial court lacked jurisdiction to entertain the contempt proceedings. We disagree.

On July 21, 1976, Coates-Miller filed a notice of appeal from an interlocutory order entered in this case granting plaintiffs a preliminary injunction. During the pendency of that appeal: (1) the discovery process with regard to the merits of this case continued at the trial level; and (2)

criminal contempt proceedings were conducted by the trial court against Rubin for wilfully impeding the progress of that discovery. Rubin contends that Coates-Miller's prior appeal from the interlocutory injunction order divested the trial court of all jurisdiction in this case and, therefore, rendered the subsequent contempt proceedings void.

■■ ■ Rubin, however, misconceives the effect Coates-Miller's prior appeal had upon the trial court's jurisdiction. The filing of the notice of appeal, from the interlocutory injunction order, did not divest the trial court of *all* jurisdiction in this case; it merely served to restrain the trial court from either changing or modifying the injunction order, and from taking any other action which would interfere with appellate review of that order. *Cygnar v. Martin-Trigona* (1975), 26 Ill. App. 3d 291, 325 N.E.2d 76; *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 252 N.E.2d 93; *Lind v. Spanuth* (1956), 8 Ill. App. 2d 442, 449-55, 131 N.E.2d 796, 800-03 (Feinberg, J., specially concurring), *aff'd* (1956), 9 Ill. 2d 311, 137 N.E.2d 360; see generally *Southland Corp. v. Village of Hoffman Estates* (1970), 130 Ill. App. 2d 311, 264 N.E.2d 451; S. Karasik, *Jurisdiction of Trial Court After Notice of Appeal*, 53 Ill. B. J. 30 (1964).

The trial court had jurisdiction to continue pretrial discovery and, therefore, could and properly did maintain contempt proceedings against Rubin for willfully impeding the progress of that discovery. The contempt proceedings did not affect the substantive issues on Coates-Miller's appeal from the interlocutory injunction order and did not, in any way, alter the nature of that appeal.

## II

Rubin next contends that the trial judge erred in not recusing himself from the contempt proceedings. Again, we disagree.

■ While Rubin did not make a motion in the trial court to substitute judges,[4] he argues on appeal that it was the trial judge's obligation to automatically recuse himself from the rule to show cause proceeding. In ascertaining whether the trial judge had a duty to act *sua sponte*, we must determine not only "whether there was *actual bias* on [the judge's] part, but also whether there was '*such a likelihood of bias or an appearance of bias* that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' [Citation.]" (Emphasis added.) *Taylor v. Hayes* (1974), 418 U.S. 488, 501, 41 L. Ed. 2d 897, 909, 94 S. Ct. 2697, 2704.

A detailed examination of the record reveals no bias whatsoever on

---

[4] Motions for substitution of judges in cases involving indirect criminal contempt are governed by section 114—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—5; *People v. Winchell* (1977), 45 Ill. App. 3d 752, 359 N.E.2d 487; *People v. Wright* (1974), 20 Ill. App. 3d 96, 312 N.E.2d 727; see *People ex rel. Kunce v. Hogan* (1977), 67 Ill. 2d 55, 364 N.E.2d 50 (direct criminal contempt)) and by section 21a of "An Act to revise the law in relation to change of venue" (Ill. Rev. Stat. 1977, ch. 110, par. 522).

the part of the trial judge. Furthermore, the nature of the contemptuous conduct involved in this case does not of itself raise a likelihood or even an appearance of bias. Rubin did not criticize or impugn the integrity and character of the trial judge. (Compare *Ungar v. Sarafite* (1964), 376 U.S. 575, 11 L. Ed. 2d 921, 84 S. Ct. 841, with *Cooke v. United States* (1925), 267 U.S. 517, 69 L. Ed. 767, 45 S. Ct. 390, and *Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 27 L. Ed. 2d 532, 91 S. Ct. 499; see also *People v. Dorris* (1978), 57 Ill. App. 3d 378, 373 N.E.2d 77; *People v. Barrett* (1976), 35 Ill. App. 3d 939, 342 N.E.2d 775; Ill. Rev. Stat. 1977, ch. 110, par. 522.) Nor did Rubin become personally embroiled with the trial judge in a running and bitter controversy. See *Taylor v. Hayes* (1974), 418 U.S. 488, 41 L. Ed. 2d 897, 94 S. Ct. 2697.

Rather, the contemptuous conduct involved in this case concerned Rubin's willful failure to ensure his party's compliance with two discovery orders. We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with this type of resistance to their authority. Moreover, the record discloses that the trial judge here, conducted the rule-to-show-cause hearing dispassionately and in an atmosphere of fairness and objectivity befitting a judicial proceeding. The trial judge was able to and did in fact maintain "that calm detachment necessary for fair adjudication." *Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 465, 27 L. Ed. 2d 532, 540, 91 S. Ct. 499, 505.

■ Under the circumstances presented by this case, we find that the trial judge was not required to recuse himself from the contempt proceedings.

### III

Rubin next contends that the evidence produced at the rule-to-show-cause proceeding indicates his conduct was not contemptuous. On the contrary, the evidence submitted at the hearing establishes beyond any reasonable doubt (*O'Leary v. Allphin* (1976), 64 Ill. 2d 500, 356 N.E.2d 551) that Rubin's refusal to comply with the trial court's discovery orders of July 7 and July 14 was wilful and contumacious. The record is devoid of *any* credible evidence which would support Rubin's claim that his disregard of the trial court's authority was warranted by extenuating circumstances and events.

We have examined the numerous other contentions raised by Rubin in his brief. Suffice it to say that we find them all to be without merit and bordering on the frivolous.

Accordingly, for the reasons stated, we affirm the judgment of the trial court.

Affirmed.

JOHNSON and ROMITI, JJ., concur.